# SANTA FE INDUSTRIES, INC., ET AL. *v.* GREEN ET AL.

No. 75–1753.   Argued January 18–19, 1977—Decided March 23, 1977

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, MARSHALL, POWELL, and REHNQUIST, JJ., joined, and in all but Part IV of which BLACKMUN and STEVENS, JJ., joined. BLACKMUN, J., *post,* p. 480, and STEVENS, J., *post,* p. 480, filed opinions concurring in part. BRENNAN, J., filed a dissenting statement, *post,* p. 480.

*William R. Glendon* argued the cause for petitioners. With him on the briefs were *Robert D. Larsen* and *Guy C. Quinlan.*

*Sidney Bender* argued the cause for respondents. With him on the brief was *Aaron Lewittes.*

MR. JUSTICE WHITE delivered the opinion of the Court.

The issue in this case involves the reach and coverage of § 10 (b) of the Securities Exchange Act of 1934 and Rule 10b–5 [1] thereunder in the context of a Delaware short-form

---

[1] Section 10 of the Securities Exchange Act of 1934, 15 U. S. C. § 78j, provides in relevant part:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

.          .          .          .          .

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Rule 10b–5, 17 CFR § 240.10b–5 (1976), provides:

"Employment of manipulative and deceptive devices.

"It shall be unlawful for any person, directly or indirectly, by the use of

merger transaction used by the majority stockholder of a corporation to eliminate the minority interest.

## I

In 1936, petitioner Santa Fe Industries, Inc. (Santa Fe), acquired control of 60% of the stock of Kirby Lumber Corp. (Kirby), a Delaware corporation. Through a series of purchases over the succeeding years, Santa Fe increased its control of Kirby's stock to 95%; the purchase prices during the period 1968–1973 ranged from $65 to $92.50 per share.[2] In 1974, wishing to acquire 100% ownership of Kirby, Santa Fe availed itself of § 253 of the Delaware Corporation Law, known as the "short-form merger" statute. Section 253 permits a parent corporation owning at least 90% of the stock of a subsidiary to merge with that subsidiary, upon approval by the parent's board of directors, and to make payment in cash for the shares of the minority stockholders. The statute does not require the consent of, or advance notice to, the minority stockholders. However, notice of the merger must be given within 10 days after its effective date, and any stockholder who is dissatisfied with the terms of the merger may petition the Delaware Court of Chancery for a decree ordering the surviving corporation to pay him the fair value

---

any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

"in connection with the purchase or sale of any security."

[2] App. 33a (merger information statement, considered by parties and court below as part of the amended complaint). Sante Fe controlled Kirby through its wholly owned subsidiary, Santa Fe Natural Resources, Inc., which owned the Kirby stock.

of his shares, as determined by a court-appointed appraiser subject to review by the court. Del. Code Ann., Tit. 8, §§ 253, 262 (1975 ed. and Supp. 1976).

Santa Fe obtained independent appraisals of the physical assets of Kirby—land, timber, buildings, and machinery— and of Kirby's oil, gas, and mineral interests. These appraisals, together with other financial information, were submitted to Morgan Stanley & Co. (Morgan Stanley), an investment banking firm retained to appraise the fair market value of Kirby stock. Kirby's physical assets were appraised at $320 million (amounting to $640 for each of the 500,000 shares); Kirby's stock was valued by Morgan Stanley at $125 per share. Under the terms of the merger, minority stockholders were offered $150 per share.

The provisions of the short-form merger statute were fully complied with.[3] The minority stockholders of Kirby were notified the day after the merger became effective and were advised of their right to obtain an appraisal in Delaware court if dissatisfied with the offer of $150 per share. They also received an information statement containing, in addition to the relevant financial data about Kirby, the appraisals of the value of Kirby's assets and the Morgan Stanley appraisal concluding that the fair market value of the stock was $125 per share.

Respondents, minority stockholders of Kirby, objected to the terms of the merger, but did not pursue their appraisal

---

[3] The merger became effective on July 31, 1974, and was accomplished in the following way. A new corporation, Forest Products, Inc., was organized as a Delaware corporation. The Kirby stock, together with cash, was transferred from Santa Fe's wholly owned subsidiary (see n. 2, *supra*) to Forest Products in exchange for all of the Forest Products stock. The new corporation was then merged into Kirby, with Kirby as the surviving corporation. The cash transferred to Forest Products was used to make the purchase offer for the Kirby shares not owned by the Santa Fe subsidiary.

remedy in the Delaware Court of Chancery.[4] Instead, they brought this action in federal court on behalf of the corporation and other minority stockholders, seeking to set aside the merger or to recover what they claimed to be the fair value of their shares. The amended complaint asserted that, based on the fair market value of Kirby's physical assets as revealed by the appraisal included in the information statement sent to minority shareholders, Kirby's stock was worth at least $772 per share.[5] The complaint alleged further that the merger took place without prior notice to minority stockholders; that the purpose of the merger was to appropriate the difference between the "conceded pro rata value of the physical assets," App. 103a, and the offer of $150 per share—to "freez[e] out the minority stockholders at a wholly inadequate price," *id.,* at 100a; and that Santa Fe, knowing the appraised value of the physical assets, obtained a "fraudulent appraisal" of the stock from Morgan Stanley and offered $25 above that appraisal "in order to lull the minority stockholders into erroneously believing that [Santa Fe was] generous." *Id.,* at 103a. This course of conduct was alleged to be "a violation of Rule 10b-5 because defendants employed a 'device, scheme, or artifice to defraud' and engaged in an 'act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale

---

[4] On August 21, 1974, respondents petitioned for an appraisal of their Kirby stock, but they withdrew that petition on September 9 and the next day commenced this lawsuit.

[5] The figure of $772 per share was calculated as follows: "The difference of $311,000,000 ($622 per share) between the fair market value of Kirby's land and timber, alone, as per the defendants' own appraisal thereof at $320,000,000 and the $9,000,000 book value of said land and timber, added to the $150 per share, yields a pro rata share of the value of the physical assets of Kirby of at least $772 per share. The value of the stock was at least the pro rata value of the physical assets." App. 102a.

of any security.' " *Ibid.*[6]  Morgan Stanley assertedly participated in the fraud as an accessory by submitting its appraisal of $125 per share although knowing the appraised value of the physical assets.

The District Court dismissed the complaint for failure to state a claim upon which relief could be granted.  391 F. Supp. 849 (SDNY 1975).  As the District Court understood the complaint, respondents' case rested on two distinct grounds.  First, federal law was assertedly violated because the merger was for the sole purpose of eliminating the minority from the company, therefore lacking any justifiable business purpose, and because the merger was undertaken without prior notice to the minority shareholders.  Second, the low valuation placed on the shares in the cash-exchange offer was itself said to be a fraud actionable under Rule 10b–5. In rejecting the first ground for recovery, the District Court reasoned that Delaware law required neither a business purpose for a short-form merger nor prior notice to the minority shareholders who the statute contemplated would be removed from the company, and that Rule 10b–5 did not override these provisions of state corporate law by independently placing a duty on the majority not to merge without prior notice and without a justifiable business purpose.

As for the claim that actionable fraud inhered in the allegedly·gross undervaluation of the minority shares, the District Court observed that respondents valued their shares at a minimum of $772 per share, "basing this figure on the *pro rata* value of Kirby's physical assets."  *Id.*, at 853.  Accepting this

---

[6] The complaint also alleged a breach of fiduciary duty under state law and asserted that the federal court had both diversity and pendent jurisdiction over this claim.  The District Court found an absence of complete diversity of citizenship between the plaintiffs and defendants because of the defendant Morgan Stanley and refused to exercise pendent jurisdiction because it held that the complaint failed to state a claim under the federal securities laws.  391 F. Supp. 849, 855 (SDNY 1975).

valuation for purposes of the motion to dismiss, the District Court further noted that, as revealed by the complaint, the physical asset appraisal, along with other information relevant to Morgan Stanley's valuation of the shares, had been included with the information statement sent to respondents within the time required by state law. It thought that if "full and fair disclosure is made, transactions eliminating minority interests are beyond the purview of Rule 10b–5," and concluded that the "complaint fail[ed] to allege an omission, misstatement or fraudulent course of conduct that would have impeded a shareholder's judgment of the value of the offer." *Id.,* at 854. The complaint therefore failed to state a claim and was dismissed.[7]

A divided Court of Appeals for the Second Circuit reversed. 533 F. 2d 1283 (1976). It first agreed that there was a double aspect to the case: first, the claim that gross undervaluation of the minority stock itself violated Rule 10b–5; and second, that "without any misrepresentation or failure to disclose relevant facts, the merger itself constitutes a violation of Rule 10b–5" because it was accomplished without any corporate purpose and without prior notice to the minority stockholders. *Id.,* at 1285. As to the first aspect of the case, the Court of Appeals did not disturb the District Court's conclusion that the complaint did not allege a material misrepresentation or nondisclosure with respect to the value of the stock; and the court declined to rule that a claim of gross

---

[7] The District Court also based its holding on the alternative ground that the injuries alleged in the complaint were not causally related to any deception by the majority shareholder:

"Assuming *arguendo* that the merger information statement did not constitute adequate disclosure, the amended complaint does not demonstrate a causal connection between the alleged deception and plaintiffs' damages. Plaintiffs did not tender their shares for cancellation and payment pursuant to this merger plan. . . . From the outset, plaintiffs recognized the alleged deception and did not rely upon it." 391 F. Supp., at 855.

undervaluation itself would suffice to make out a Rule 10b–5 case. With respect to the second aspect of the case, however, the court fundamentally disagreed with the District Court as to the reach and coverage of Rule 10b–5. The Court of Appeals' view was that, although the Rule plainly reached material misrepresentations and nondisclosures in connection with the purchase or sale of securities, neither misrepresentation nor nondisclosure was a necessary element of a Rule 10b–5 action; the Rule reached "breaches of fiduciary duty by a majority against minority shareholders without any charge of misrepresentation or lack of disclosure." *Id.*, at 1287.[8] The court went on to hold that the complaint, taken as a whole, stated a cause of action under the Rule:

> "We hold that a complaint alleges a claim under Rule 10b–5 when it charges, in connection with a Delaware short-form merger, that the majority has committed a breach of its fiduciary duty to deal fairly with minority shareholders by effecting the merger without any justifiable business purpose. The minority shareholders are given no prior notice of the merger, thus having no opportunity to apply for injunctive relief, and the proposed price to be paid is substantially lower than the appraised value reflected in the Information Statement." *Id.*, at 1291.

See also *id.*, at 1289.[9]

---

[8] The court concluded its discussion thus:
"Whether full disclosure has been made is not the crucial inquiry since it is the merger and the undervaluation which constituted the fraud, and not whether or not the majority determines to lay bare their real motives. If there is no valid corporate purpose for the merger, then even the most brazen disclosure of that fact to the minority shareholders in no way mitigates the fraudulent conduct." 533 F. 2d, at 1292.

[9] The Court of Appeals affirmed, however, the dismissal of the complaint against Morgan Stanley. As the Court of Appeals understood it, Morgan Stanley had not been charged with participating in the majority shareholder's breach of fiduciary duty; it had been involved only in evaluation

We granted the petition for certiorari challenging this holding because of the importance of the issue involved to the administration of the federal securities laws. 429 U. S. 814 (1976). We reverse.

## II

Section 10 (b) of the 1934 Act makes it "unlawful for any person . . . to use or employ . . . any manipulative or deceptive device or contrivance in contravention of [Securities and Exchange Commission rules]"; Rule 10b-5, promulgated by the SEC under § 10 (b), prohibits, in addition to nondisclosure and misrepresentation, any "artifice to defraud" or any act "which operates or would operate as a fraud or deceit." [10] The court below construed the term "fraud" in Rule 10b-5 by adverting to the use of the term in several of this Court's decisions in contexts other than the 1934 Act and the related Securities Act of 1933, 15 U. S. C. § 77a *et seq.*[11] The Court

---

of the stock and the compilation of its report with respect thereto. The complaint contained "no allegation that Morgan Stanley & Co. engaged in any misrepresentation or nondisclosure such as would support its liability under Rule 10b-5 (2)." *Ibid.*

[10] See n. 1, *supra.*

[11] The Court of Appeals quoted passages from *Pepper* v. *Litton,* 308 U. S. 295, 306, 311 (1939) (where this Court upheld the disallowance of a bankruptcy claim of a controlling stockholder who violated his fiduciary obligation to the other stockholders), and from 1 J. Story, Equity Jurisprudence § 187 (1853); the court also cited cases that quoted the passage from Mr. Justice Story's treatise—*Moore* v. *Crawford,* 130 U. S. 122, 128 (1889) (a diversity suit to compel execution of a deed held in constructive trust), and *SEC* v. *Capital Gains Research Bureau,* 375 U. S. 180, 194 (1963) (Investment Advisers Act of 1940 prohibits, as a "fraud or deceit upon any client," a registered investment adviser's failure to disclose to his clients his own financial interest in his recommendations). Although *Capital Gains* involved a federal securities statute, the Court's references to fraud in the "equitable" sense of the term were premised on its recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers. See *id.,* at 191–192, 194. Moreover, the fraud that the SEC sought to enjoin in *Capital Gains* was, in fact, a nondisclosure.

of Appeals' approach to the interpretation of Rule 10b–5 is inconsistent with that taken by the Court last Term in *Ernst & Ernst* v. *Hochfelder,* 425 U. S. 185 (1976).

*Ernst & Ernst* makes clear that in deciding whether a complaint states a cause of action for "fraud" under Rule 10b–5, "we turn first to the language of § 10 (b), for '[t]he starting point in every case involving construction of a statute is the language itself.' " *Id.,* at 197, quoting *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723, 756 (1975) (POWELL, J., concurring). In holding that a cause of action under Rule 10b–5 does not lie for mere negligence, the Court began with the principle that "[a]scertainment of congressional intent with respect to the standard of liability created by a particular section of the [1933 and 1934] Acts must . . . rest primarily on the language of that section," 425 U. S., at 200, and then focused on the statutory language of § 10 (b)—"[t]he words 'manipulative or deceptive' used in conjunction with 'device or contrivance.' " *Id.,* at 197. The same language and the same principle apply to this case.

To the extent that the Court of Appeals would rely on the use of the term "fraud" in Rule 10b–5 to bring within the ambit of the Rule all breaches of fiduciary duty in connection with a securities transaction, its interpretation would, like the interpretation rejected by the Court in *Ernst & Ernst,* "add a gloss to the operative language of the statute quite different from its commonly accepted meaning." *Id.,* at 199. But, as the Court there held, the language of the statute must control the interpretation of the Rule:

"Rule 10b–5 was adopted pursuant to authority granted the [Securities and Exchange] Commission under § 10 (b). The rulemaking power granted to an administrative agency charged with the administration of a federal statute is not the power to make law. Rather, it is ' "the power to adopt regulations to carry into effect the will of Congress as expressed by the statute." '. . . [The

scope of the Rule] cannot exceed the power granted the Commission by Congress under § 10 (b)." *Id.*, at 212–214.[12]

The language of § 10 (b) gives no indication that Congress meant to prohibit any conduct not involving manipulation or deception. Nor have we been cited to any evidence in the legislative history that would support a departure from the language of the statute.[13] "When a statute speaks so specifically in terms of manipulation and deception, . . . and when its history reflects no more expansive intent, we are quite unwilling to extend the scope of the statute . . . ." *Id.*, at 214. Thus the claim of fraud and fiduciary breach in this complaint states a cause of action under any part of Rule 10b–5 only if

---

[12] The case for adhering to the language of the statute is even stronger here than in *Ernst & Ernst*, where the interpretation of Rule 10b–5 rejected by the Court was strongly urged by the Commission. See also *Piper* v. *Chris-Craft Industries, Inc., ante,* p. 1, and *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723 (1975) (rejecting interpretations of Rule 10b–5 urged by the SEC as *amicus curiae*). By contrast, the Commission apparently has not concluded that Rule 10b–5 should be used to reach "going private" transactions where the majority stockholder eliminates the minority at an allegedly unfair price. See SEC Securities Act Release No. 5567 (Feb. 6, 1975), CCH Fed. Sec. L. Rep. ¶ 80,104 (proposing Rules 13e–3A and 13e–3B dealing with "going private" transactions, pursuant to six sections of the 1934 Act including § 10 (b), but stating that the Commission "has reached no conclusions with respect to the proposed rules"). Because we are concerned here only with § 10 (b), we intimate no view as to the Commission's authority to promulgate such rules under other sections of the Act.

[13] As the Court noted in *Ernst & Ernst:* "Neither the intended scope of § 10 (b) nor the reasons for the changes in its operative language are revealed explicitly in the legislative history of the 1934 Act, which deals primarily with other aspects of the legislation." 425 U. S., at 202. The only specific reference to § 10 in the Senate Report on the 1934 Act merely states that the section was "aimed at those manipulative and deceptive practices which have been demonstrated to fulfill no useful function." S. Rep. No. 792, 73d Cong., 2d Sess., 6 (1934).

the conduct alleged can be fairly viewed as "manipulative or deceptive" within the meaning of the statute.

## III

It is our judgment that the transaction, if carried out as alleged in the complaint, was neither deceptive nor manipulative and therefore did not violate either § 10 (b) of the Act or Rule 10b–5.

As we have indicated, the case comes to us on the premise that the complaint failed to allege a material misrepresentation or material failure to disclose. The finding of the District Court, undisturbed by the Court of Appeals, was that there was no "omission" or "misstatement" in the information statement accompanying the notice of merger. On the basis of the information provided, minority shareholders could either accept the price offered or reject it and seek an appraisal in the Delaware Court of Chancery. Their choice was fairly presented, and they were furnished with all relevant information on which to base their decision.[14]

We therefore find inapposite the cases relied upon by respondents and the court below, in which the breaches of

---

[14] In addition to their principal argument that the complaint alleges a fraud under clauses (a) and (c) of Rule 10b–5, respondents also argue that the complaint alleges nondisclosure and misrepresentation in violation of clause (b) of the Rule. Their major contention in this respect is that the majority stockholder's failure to give the minority advance notice of the merger was a material nondisclosure, even though the Delaware short-form merger statute does not require such notice. Brief for Respondents 27. But respondents do not indicate how they might have acted differently had they had prior notice of the merger. Indeed, they accept the conclusion of both courts below that under Delaware law they could not have enjoined the merger because an appraisal proceeding is their sole remedy in the Delaware courts for any alleged unfairness in the terms of the merger. Thus, the failure to give advance notice was not a material nondisclosure within the meaning of the statute or the Rule. Cf. *TSC Industries, Inc.* v. *Northway, Inc.*, 426 U. S. 438 (1976).

fiduciary duty held violative of Rule 10b–5 included some element of deception.[15]   Those cases forcefully reflect the principle that "[§] 10 (b) must be read flexibly, not technically

---

[15] The decisions of this Court relied upon by respondents all involved deceptive conduct as part of the Rule 10b–5 violation alleged. *Affiliated Ute Citizens* v. *United States,* 406 U. S. 128 (1972) (misstatements of material fact used by bank employees in position of market maker to acquire stock at less than fair value); *Superintendent of Insurance* v. *Bankers Life & Cas. Co.,* 404 U. S. 6, 9 (1971) ("seller [of bonds] was duped into believing that it, the seller, would receive the proceeds").   Cf. *SEC* v. *Capital Gains Research Bureau,* 375 U. S. 180 (1963) (injunction under Investment Advisers Act of 1940 to compel registered investment adviser to disclose to his clients his own financial interest in his recommendations).

We have been cited to a large number of cases in the Courts of Appeals, all of which involved an element of deception as part of the fiduciary misconduct held to violate Rule 10b–5.   *E. g., Schoenbaum* v. *Firstbrook,* 405 F. 2d 215, 220 (CA2 1968) (en banc), cert. denied, 395 U. S. 906 (1969) (majority stockholder and board of directors "were guilty of deceiving" the minority stockholders); *Drachman* v. *Harvey,* 453 F. 2d 722, 733, 736, 737 (CA2 1972) (en banc) (Rule 10b–5 violation alleged on facts found "indistinguishable" from *Superintendent of Insurance* v. *Bankers Life & Cas. Co.*); *Schlick* v. *Penn-Dixie Cement Corp.,* 507 F. 2d 374 (CA2 1974), cert. denied, 421 U. S. 976 (1975) (scheme of market manipulation and merger on unfair terms, one aspect of which was misrepresentation); *Pappas* v. *Moss,* 393 F. 2d 865, 869 (CA3 1968) ("if a 'deception' is required in the present context [of § 10 (b) and Rule 10b–5], it is fairly found by viewing this fraud as though the 'independent' stockholders were standing in the place of the defrauded corporate entity," where the board of directors passed a resolution containing at least two material misrepresentations and authorizing the sale of corporate stock to the directors at a price below fair market value); *Shell* v. *Hensley,* 430 F. 2d 819, 825 (CA5 1970) (derivative suit alleging that corporate officers used misleading proxy materials and other reports to deceive shareholders regarding a bogus employment contract intended to conceal improper payments to the corporation president and regarding purchases by the corporation of certain securities at excessive prices); *Rekant* v. *Desser,* 425 F. 2d 872, 882 (CA5 1970) (as part of scheme to cause corporation to issue Treasury shares and a promissory note for grossly inadequate consideration, corporate officers deceived shareholders by making affirma-

and restrictively" and that the statute provides a cause of action for any plaintiff who "suffer[s] an injury as a result of deceptive practices touching its sale [or purchase] of securities . . . ." *Superintendent of Insurance* v. *Bankers Life & Cas. Co.*, 404 U. S. 6, 12–13 (1971). But the cases do not support the proposition, adopted by the Court of Appeals below and urged by respondents here, that a breach of fiduciary duty by majority stockholders, without any deception, misrepresentation, or nondisclosure, violates the statute and the Rule.

It is also readily apparent that the conduct alleged in the complaint was not "manipulative" within the meaning of the statute. "Manipulation" is "virtually a term of art when used in connection with securities markets." *Ernst & Ernst,* 425 U. S., at 199. The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity. See, *e. g.*, § 9 of the 1934 Act, 15 U. S. C. § 78i (prohibiting specific manipulative practices); *Ernst & Ernst, supra,* at 195, 199 n. 21, 205; *Piper* v. *Chris-Craft Industries, Inc., ante,* at 43 (Rule 10b–6, also promulgated under § 10 (b), is "an antimanipulative provision designed to protect the orderliness of the securities market during distributions of stock" and "to prevent stimulative trading by an issuer in its own securities in order to create an unnatural and unwarranted appearance of market activity"); 2 A. Bromberg, Securities Law: Fraud § 7.3 (1975); 3 L. Loss, Securities Regulation 1541–1570 (2d ed. 1961); 6 *id.,* at 3755–3763 (Supp. 1969). Section 10 (b)'s general prohibition of practices deemed by

---

tive misrepresentations in the corporation's annual report and by failing to file any such report the next year). See Recent Cases, 89 Harv. L. Rev. 1917, 1926 (1976) (stating that no appellate decision before that of the Court of Appeals in this case and in *Marshel* v. *AFW Fabric Corp.*, 533 F. 2d 1277 (CA2), vacated and remanded for a determination of mootness, 429 U. S. 881 (1976), "had permitted a 10b–5 claim without some element of misrepresentation or nondisclosure") (footnote omitted).

the SEC to be "manipulative"—in this technical sense of artificially affecting market activity in order to mislead investors—is fully consistent with the fundamental purpose of the 1934 Act " 'to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* . . . .' " *Affiliated Ute Citizens* v. *United States,* 406 U. S. 128, 151 (1972), quoting *SEC* v. *Capital Gains Research Bureau,* 375 U. S. 180, 186 (1963). Indeed, nondisclosure is usually essential to the success of a manipulative scheme. 3 Loss, *supra,* at 1565. No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices. But we do not think it would have chosen this "term of art" if it had meant to bring within the scope of § 10 (b) instances of corporate mismanagement such as this, in which the essence of the complaint is that shareholders were treated unfairly by a fiduciary.

## IV

The language of the statute is, we think, "sufficiently clear in its context" to be dispositive here, *Ernst & Ernst, supra,* at 201; but even if it were not, there are additional considerations that weigh heavily against permitting a cause of action under Rule 10b–5 for the breach of corporate fiduciary duty alleged in this complaint. Congress did not expressly provide a private cause of action for violations of § 10 (b). Although we have recognized an implied cause of action under that section in some circumstances, *Superintendent of Insurance* v. *Bankers Life & Cas. Co., supra,* at 13 n. 9, we have also recognized that a private cause of action under the antifraud provisions of the Securities Exchange Act should not be implied where it is "unnecessary to ensure the fulfillment of Congress' purposes" in adopting the Act. *Piper* v. *Chris-Craft Industries, ante,* at 41. Cf. *J. I. Case Co.* v. *Borak,* 377 U. S. 426, 431–433 (1964). As we noted earlier, *supra,* this page, the Court repeatedly has described the

"fundamental purpose" of the Act as implementing a "philosophy of full disclosure"; once full and fair disclosure has occurred, the fairness of the terms of the transaction is at most a tangential concern of the statute. Cf. *Mills* v. *Electric Auto-Lite Co.*, 396 U. S. 375, 381–385 (1970). As in *Cort* v. *Ash,* 422 U. S. 66, 80 (1975), we are reluctant to recognize a cause of action here to serve what is "at best a subsidiary purpose" of the federal legislation.

A second factor in determining whether Congress intended to create a federal cause of action in these circumstances is "whether 'the cause of action [is] one traditionally relegated to state law . . . .' " *Piper* v. *Chris-Craft Industries, Inc., ante,* at 40, quoting *Cort* v. *Ash, supra,* at 78. The Delaware Legislature has supplied minority shareholders with a cause of action in the Delaware Court of Chancery to recover the fair value of shares allegedly undervalued in a short-form merger. See *supra,* at 465–466. Of course, the existence of a particular state-law remedy is not dispositive of the question whether Congress meant to provide a similar federal remedy, but as in *Cort* and *Piper,* we conclude that "it is entirely appropriate in this instance to relegate respondent and others in his situation to whatever remedy is created by state law." 422 U. S., at 84; *ante,* at 41.

The reasoning behind a holding that the complaint in this case alleged fraud under Rule 10b–5 could not be easily contained. It is difficult to imagine how a court could distinguish, for purposes of Rule 10b–5 fraud, between a majority stockholder's use of a short-form merger to eliminate the minority at an unfair price and the use of some other device, such as a long-form merger, tender offer, or liquidation, to achieve the same result; or indeed how a court could distinguish the alleged abuses in these going private transactions from other types of fiduciary self-dealing involving transactions in securities. The result would be to bring within the Rule a wide variety of corporate conduct traditionally left to state regulation. In addition to posing a

"danger of vexatious litigation which could result from a widely expanded class of plaintiffs under Rule 10b-5," *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S., at 740, this extension of the federal securities laws would overlap and quite possibly interfere with state corporate law. Federal courts applying a "federal fiduciary principle" under Rule 10b-5 could be expected to depart from state fiduciary standards at least to the extent necessary to ensure uniformity within the federal system.[16] Absent a clear indication of congressional intent, we are reluctant to federalize the substantial portion of the law of corporations that deals with transactions in securities, particularly where established state policies of corporate regulation would be overridden. As the Court stated in *Cort* v. *Ash, supra:* "Corporations are creatures of state law, and investors commit their funds to corporate directors on the understanding that, except where federal law *expressly* requires certain responsibilities of directors with respect to stockholders, state law will govern the internal affairs of the corporation." 422 U. S., at 84 (emphasis added).

We thus adhere to the position that "Congress by § 10 (b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement." *Superintendent of Insurance* v. *Bankers Life & Cas. Co.,* 404 U. S., at 12. There

---

[16] For example, some States apparently require a "valid corporate purpose" for the elimination of the minority interest through a short-form merger, whereas other States do not. Compare *Bryan* v. *Brock & Blevins Co.,* 490 F. 2d 563 (CA5), cert. denied, 419 U. S. 844 (1974) (merger arranged by controlling stockholder for no business purpose except to eliminate 15% minority stockholder violated Georgia short-form merger statute) with *Stauffer* v. *Standard Brands, Inc.,* 41 Del. Ch. 7, 187 A. 2d 78 (1962) (Delaware short-form merger statute allows majority stockholder to eliminate the minority interest without any corporate purpose and subject only to an appraisal remedy). Thus to the extent that Rule 10b-5 is interpreted to require a valid corporate purpose for elimination of minority shareholders as well as a fair price for their shares, it would impose a stricter standard of fiduciary duty than that required by the law of some States.

may well be a need for uniform federal fiduciary standards to govern mergers such as that challenged in this complaint. But those standards should not be supplied by judicial extension of § 10 (b) and Rule 10b–5 to "cover the corporate universe." [17]

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

MR. JUSTICE BRENNAN dissents and would affirm for substantially the reasons stated in the majority and concurring opinions in the Court of Appeals, 533 F. 2d 1283 (CA2 1976).

MR. JUSTICE BLACKMUN, concurring in part.

Like MR. JUSTICE STEVENS, I refrain from joining Part IV of the Court's opinion. I, too, regard that part as unnecessary for the decision in the instant case and, indeed, as exacerbating the concerns I expressed in my dissents in *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723, 761 (1975), and in *Ernst & Ernst* v. *Hochfelder,* 425 U. S. 185, 215 (1976). I, however, join the remainder of the Court's opinion and its judgment.

MR. JUSTICE STEVENS, concurring in part.

For the reasons stated by MR. JUSTICE BLACKMUN in his dissenting opinion in *Blue Chip Stamps* v. *Manor Drug Stores,*

---

[17] Cary, Federalism and Corporate Law: Reflections Upon Delaware, 83 Yale L. J. 663, 700 (1974) (footnote omitted). Professor Cary argues vigorously for comprehensive federal fiduciary standards, but urges a "frontal" attack by a new federal statute rather than an extension of Rule 10b–5. He writes: "It seems anomalous to jig-saw every kind of corporate dispute into the federal courts through the securities acts as they are presently written." *Ibid.* See also Note, Going Private, 84 Yale L. J. 903 (1975) (proposing the application of traditional doctrines of substantive corporate law to problems of fairness raised by "going private" transactions such as short-form mergers).

421 U. S. 723, 761,[1] and those stated in my dissent in *Piper* v. *Chris-Craft Industries, ante,* p. 53, I believe both of those cases were incorrectly decided. I foresee some danger that Part IV of the Court's opinion in this case may incorrectly be read as extending the holdings of those cases. Moreover, the entire discussion in Part IV is unnecessary to the decision of this case. Accordingly, I join only Parts I, II, and III of the Court's opinion. I would also add further emphasis to the fact that the controlling stockholders in this case did not breach any duty owed to the minority shareholders because (a) there was complete disclosure of the relevant facts, and (b) the minority are entitled to receive the fair value of their shares.[2] The facts alleged in the complaint do not constitute "fraud" within the meaning of Rule 10b–5.

---

[1] See also *Eason* v. *General Motors Acceptance Corp.,* 490 F. 2d 654 (CA7 1973), cert. denied, 416 U. S. 960.

[2] The motivation for the merger is a matter of indifference to the minority stockholders because they retain no interest in the corporation after the merger is consummated.