William ROCHE, et al., Plaintiffs,

v.

E.F. HUTTON & CO., INC., et al., Defendants.

Civ. No. 83-1422.

United States District Court,
M.D. Pennsylvania.

June 15, 1984.

Morey M. Myers, William W. Warren, Jr., Scranton, Pa., for Wm. Roche, Daniel Balish, Carolyn Hoffman, and Louis & Deborah Domiano.

Anthony F. Jeselnik, Pittsburgh, Pa., for Jeffrey V. and Rosaria A. Elwell.

Daniel E. Bacine, Samuel R. Simon, Philadelphia, Pa., Timothy E. Foley, Scranton, Pa., for E.F. Hutton & Co., Inc., Watson, Tony Thomas Clark and Katherine Clark.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

The plaintiffs commenced the above-captioned civil action on October 3, 1983, asserting causes of action under the Commodity Exchange Act (the Act), the Racketeer Influenced and Corrupt Organizations Act of 1970 (RICO), the Securities Exchange Act of 1934 (the '34 Act) and the rules and regulations of the Commodity Futures Trading Commission (CFTC) and the Securities and Exchange Commission (SEC). The plaintiffs claim that they have suffered severe losses in the commodities and securities markets as a result of the defendants' alleged mishandling of their discretionary trading accounts. They seek, *inter alia*, treble damages and attorneys' fees.

The defendants have moved to dismiss. For the reasons set forth below, the defendants' motions will be granted as to Counts VIII and IX with leave for the plaintiffs to amend and denied as to all other counts.

## FACTUAL BACKGROUND

Initially, the court notes that the allegations contained in the complaint must be accepted as true for purposes of this motion. *See, e.g., McKnight v. Southeastern Transp. Authority*, 583 F.2d 1229, 1235–36 (3d Cir.1978).

According to the complaint, sometime before July 1980 defendants Thomas and Katherine Clark agreed to act as stockbrokers for the plaintiffs. The Clarks, employees of defendant E.F. Hutton, allegedly knew of the plaintiffs' desires to invest only in stable, income-producing stocks and other securities geared toward the protection and conservation of the principal invested. Nevertheless, the Clarks subsequently persuaded the plaintiffs to open accounts with Hutton for the purpose of trading in the commodities futures market, a highly speculative area of investment.

Defendant Thomas Clark allegedly advised the plaintiffs that defendant Tony Watson, also a Hutton employee, was "an expert" in the field of commodities, had been extremely successful in trading futures and had, in fact, realized substantial gains for the benefit of other investors as well. The plaintiffs assert that Clark told them that if they entrusted their money to Watson, they would experience no losses. Indeed, Clark represented, Watson would personally guarantee success by depositing his own funds in any account that suffered a loss. Purportedly as a result of these assurances, the plaintiffs each deposited substantial sums into commodities accounts with Hutton and agreed that the defendants would have total discretion in making the trading decisions. It is alleged that during the remainder of 1980 and into 1981, the defendants "churned" the plaintiffs' commodities accounts by effecting an ex-

cessive number of trades without regard to the investors' needs and for the sole purpose of generating commissions for Watson, the Clarks and Hutton.

The Clarks reported to the plaintiffs that large profits were being made on their accounts. The plaintiffs' monthly statements, however, began to show losses. The plaintiffs allege that when questioned about this, the Clarks falsely represented to them that the monthly written statements for the accounts were inaccurate because of bookkeeping delays. In addition, the plaintiffs assert, they were told that Watson was experiencing some personal problems which affected his ability to trade effectively, but that, if the accounts remained open, sufficient amounts would soon be deposited to cover the losses. Eventually, the plaintiffs lost nearly all of the sums invested in their accounts and defendant Watson never deposited any funds to cover their losses.

## DISCUSSION

### Count I

In Count I of the complaint, the plaintiffs attempt to state a claim under the Commodity Exchange Act to redress the defendants' alleged churning of their accounts. The defendants move to dismiss this count on the ground that churning does not violate the antifraud provisions of the Act.[1] Relying upon cases decided un-

---

**1.** Section 4b of the Commodity Exchange Act provides in pertinent part:

It shall be unlawful (1) for any member of a contract market, or for any correspondent, agent, or employee of any member, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce, made or to be made, on or subject to the rules of any contract market, for or on behalf of any other person, or (2) for any person in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person if such contract for future delivery is or may be used for (a) hedging any transaction in interstate commerce in such commodity or the products

or by-products thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof—
(A) to cheat or defraud or attempt to cheat or defraud such other person;
(B) willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;
(C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person;

der Rule 10b–5,[2] the defendants assert that the plaintiffs' churning claim must be dismissed on the ground that "mere allegations of 'churning' do not properly state claims of fraud under the Commodity Exchange Act where plaintiffs concede that they expressly authorized defendants to engage in commodities transactions in their discretion, thereby entrusting the decision making to defendants." Memorandum of Law in Support of Defendants' Motion to Dismiss at 10, Document 12 of the Record. The defendants argue that the traditional element of "deception" which must be present in 10b–5 actions is absent here. In addition, the defendants contend that the requisite element of "reliance" is absent in that "it is clear that [the plaintiffs] did not rely on any misstatements or omissions in connection with any commodity futures transaction made or proposed to be made in their accounts." *Id.* at 10–11.

 For nearly 15 years it has been settled law that allegations of "churning" state a valid cause of action for fraud under Rule 10b–5 and § 10(b) of the '34 Act. *See, e.g., Booth v. Peavey Company Commodity Services,* 430 F.2d 132, 133 (8th Cir.1970); *Johnson v. Arthur Espey, Shearson, Hammill & Co.,* 341 F.Supp. 764, 766 (S.D.N.Y.1972); *Hecht v. Harris, Upham & Co.,* 283 F.Supp. 417, 437 (N.D. Cal.1968), *aff'd,* 430 F.2d 1202 (9th Cir. 1970). The defendants assert, however, that "[m]any of the decisions cited by plaintiffs which appear to uphold a claim of 'churning' ... predate the decision of the Supreme Court in *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), and therefore are inapposite." Reply Memorandum in Sup-

port of Defendants' Motion to Dismiss the Complaint at 8, Document 19 of the Record. In *Santa Fe,* the Supreme Court observed that "[t]he language of § 10(b) gives no indication that Congress meant to prohibit any conduct not involving manipulation or deception." 430 U.S. at 473, 97 S.Ct. at 1301. Accordingly, the Court held that a simple breach of fiduciary duty, without more, does not rise to the level of a 10b–5 violation merely because it occurs in connection with a securities transaction. *Id.* at 472, 97 S.Ct. at 1300. *See generally* Note, *Suits for Breach of Fiduciary Duty Under Rule 10b–5 After Santa Fe Industries, Inc. v. Green,* 91 Harv.L.Rev. 1874 (1978). In light of the Supreme Court's more restrictive view of Rule 10b–5 in *Santa Fe,* the defendants assert that the early churning cases must be reexamined in light of that later case. Reply Memorandum at 9.

The defendants' position relies upon the premise that churning amounts only to a breach of fiduciary obligations and does not involve deception. This is a misconception. Churning "is in the nature of a constructive fraud and constitutes a deceptive scheme under Rule 10b–5." *Gleit v. Shearson, Hammill & Co., Inc.,* [1977] Fed.Sec.L.Rep. ¶ 95,799 at 90,889 (S.D.N.Y. 1976). As stated in the seminal case of *Hecht v. Harris, Upham & Co.,* 283 F.Supp. 417, 432–33 (N.D.Cal.1968), *aff'd,* 430 F.2d 1202 (9th Cir.1970):

Where a customer so relies upon the recommendations of the broker that the broker is in a position to control the volume and frequency of transactions and the broker, abusing the confidence

----

....

7 U.S.C. § 6b.

**2.** 17 C.F.R. § 240.10b–5. Rule 10b–5, promulgated by the SEC pursuant to its authority under § 10(b) of the '34 Act, provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

reposed in him, recommends and induces an excessive number of transactions, involving multiple trading in the same security and switches from one security to another, on which commissions and profits are taken without regard to the needs and objectives of the customer, then there is a device, scheme or artifice to defraud within the meaning of [Rule 10b–5].

283 F.Supp. at 432–33 (citations omitted).

Many courts have considered allegations of churning since *Santa Fe* was decided. *See, e.g., Armstrong v. McAlpin,* 699 F.2d 79 (2d Cir.1983); *Karlen v. Ray E. Friedman & Co. Commodities,* 688 F.2d 1193 (8th Cir.1982); *Miley v. Oppenheimer & Co., Inc.,* 637 F.2d 318 (5th Cir.1981); *Hagstrom v. Breutman,* 572 F.Supp. 692 (N.D. Ill.1983); *Yancoski v. E.F. Hutton & Co., Inc.,* 581 F.Supp. 88 (E.D.Pa.1983). Although the defendants represent that "the post-*Santa Fe* decisions do not even mention, let alone address, the impact of the Supreme Court's decision ... on the concept of 'churning,'" Reply Memorandum, *supra,* at 8–9, the court has found two cases on point.

In *Armstrong v. McAlpin,* 699 F.2d at 91, the Second Circuit, in an opinion authored by Judge Van Graafeiland, stated:

The district court also believed that the charge of churning was defective for failing to allege misrepresentation or the withholding of material facts by McAlpin. This, too, was error. Churning, in and of itself, may be a deceptive and manipulative device under section 10(b), the scienter required by section 10(b) being implicit in the nature of the conduct. *Newburger, Loeb & Co. v. Gross,* 563 F.2d 1057, 1069–70 (2d Cir.1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978); *Hecht v. Harris, Upham & Co.,* 430 F.2d 1202, 1209 (9th Cir.1970). The district court's reliance upon *Santa Fe Industries v. Green, supra,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 was misplaced. That case did not involve the deceptive or manipulative type of practice that is proscribed by

section 10(b). *Id.* at 474, 97 S.Ct. at 1301. Churning, as allegedly practiced in this case, may. The churning claim against McAlpin and New Providence should not have been dismissed on motion.

699 F.2d at 91. Similarly, in *Yancoski v. E.F. Hutton & Co., Inc.,* 581 F.Supp. 88, 91 (E.D.Pa.1983), Judge Hannum of the Eastern District commented:

Defendants properly recognize that Count I complains of "churning" the account. Defendants contend, however, that churning is not a cognizable violation of either the Act or Rule 10b–5. Instead, maintain Krakovitz and E.F. Hutton, the churning of the account represents a mere breach of a fiduciary relationship and not a manipulative or deceptive act proscribed by federal law.

If churning constitutes only a breach of fiduciary relations, then federal securities law does not cover the activity. *See Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 476 [97 S.Ct. 1292, 1302, 51 L.Ed.2d 480] (1977). Churning is, however, more than defendants claim. The cases recognize churning is a deceptive practice which constitutes a violation of Section 10(b) of the Act and Rule 10b–5....

*Yancoski,* at 91 (footnote omitted).

 Having carefully reviewed applicable authority, the court concludes that churning is a violation of § 4b of the Commodity Exchange Act. *See, e.g., Booth v. Peavey Company Commodity Services,* 430 F.2d at 133; *Shelley v. Noffsinger,* 511 F.Supp. 687, 692 (N.D.Ill.1981); *Kawabata v. E.F. Hutton & Co., Inc.,* CFTC Docket No. R–77–382–7867, Findings of Fact and Conclusions of Law ¶ 6 (CFTC Initial Decision and Order Oct. 21, 1981). Accordingly, a valid cause of action may be stated. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 356, 102 S.Ct. 1825, 1827, 72 L.Ed.2d 182 (1982).

 Even if a valid claim for churning can be stated under the Act, however, the defendants assert that the instant complaint nevertheless must be dismissed on

the ground that it fails to comply with the standard of pleading set forth in Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) provides that allegations concerning fraud must be "stated with particularity." Fed.R.Civ.P. 9(b). This rule governs in commodities fraud cases. *See, e.g., Shelley v. Noffsinger,* 511 F.Supp. 687, 692 (N.D.Ill.1981).

Although some courts have opined that churning may be "pleaded generally and without specific detail," *Kaufman v. Magid,* 539 F.Supp. 1088, 1095 (D.Mass.1982), the better rule appears to be that specificity of pleading is required in these cases, *see, e.g., Hagstrom v. Breutman,* 572 F.Supp. at 698; *Russo v. Bache Halsey Stuart Shields, Inc.,* 554 F.Supp. 613, 617–18 (N.D.Ill.1982). It is unclear, however, to what degree a court should insist upon factually specific allegations. For instance, some courts have stated that the complaint must set forth "such particulars as the nature, amount and dates of the transactions at issue." *Shelley v. Noffsinger,* 511 F.Supp. at 692; *see also Vetter v. Shearson Hayden Stone, Inc.,* 481 F.Supp. 64, 66 (S.D.N.Y.1979). In contrast, it also has been noted that:

> The essence of a churning claim is not a particular transaction, it is the aggregation of transactions, allegedly excessive in number, judged in relation to the plaintiff's investment objectives and the market conditions at that time.... For this reason, it serves no useful purpose to require the plaintiffs to list with particularity every transaction relevant to their claim.

*Baselski v. Paine, Webber, Jackson & Curtis, Inc.,* 514 F.Supp. 535, 541 (N.D.Ill. 1981).

In determining the extent to which the instant complaint satisfies the standard of pleading embodied in Rule 9(b), the court finds guidance in the recent opinion authored by Judge Gibbons in *Christidis v. First Pennsylvania Mortgage Trust,* 717 F.2d 96 (3d Cir.1983). Judge Gibbons warned that "[i]n applying the first sentence of Rule 9(b) courts must be sensitive to the fact that its application, prior to discovery, may permit sophisticated defrauders to successfully conceal the details of their fraud. Moreover, in applying the rule, focusing exclusively on its 'particularity' language 'is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules.'" 717 F.2d at 99–100 (quoting 5 C. Wright & A. Miller, *Federal Practice and Procedure,* ¶ 1298 at 407 (1969)).[3]

■ After carefully reviewing the complaint, the court concludes that the standard of pleading set forth in Rule 9(b) is satisfied here. In churning cases, a plaintiff's pleading "should, at a minimum, set forth a statement of fact which would permit a determination of either the turnover ratio of the account, *or* the percentage of the account value paid in commissions." *Baselski v. Paine, Webber, Jackson & Curtis, Inc.,* 514 F.Supp. at 541 (footnotes omitted) (emphasis added); *accord, Hagstrom v. Breutman,* 572 F.Supp. at 698; *Shelley v. Noffsinger,* 511 F.Supp. at 692.[4] The plaintiffs have set forth allegations

---

**3.** In *Christidis,* the court rejected the notion that Rule 9(b) should be construed "as a special pleading rule designed to facilitate the disposition, before discovery, of what they refer to as strike suits in the securities industry." 717 F.2d at 99. Judge Gibbons noted that this strict construction of the rule has some support within the Second Circuit. *Id.; see, e.g., Billard v. Rockwell International Corp.,* 683 F.2d 51, 57 (2d Cir.1982). To the extent that the defendants ask the court to adopt a similar rule of strict construction, *see* Memorandum of Law in Support of Defendants' Motion to Dismiss at 23–24, Document 12 of the Record, the request will be denied.

**4.** The "turnover ratio" of an account equals "the ratio of the total cost of the purchases made for the account during a given period to the amount invested." Note, *Churning by Securities Dealers,* 80 *Harv.L.Rev.* 869, 875 (1967). This ratio is used to show that trading in an account has been excessive. "While there is no clear line of demarcation, courts and commentators have suggested that an annual turnover rate of six reflects excessive trading." *Mihara v. Dean Witter & Co., Inc.,* 619 F.2d 814, 821 (9th Cir.1980) (citations omitted).

which apprise both the defendants and the court of this data.[5] Hence, the defendants' motion to dismiss Count I will be denied.[6]

*Count II*

■■■ The defendants advance four arguments to support their contention that the plaintiffs' RICO claims should be dismissed. First, it is argued that Count II does not comply with Rule 9(b). Although the question is somewhat closer than is the case with respect to Count I, the court finds the plaintiffs' allegations to be sufficiently specific. Second, the defendants suggest that the RICO civil remedies should be available only in cases in which there is a demonstrable nexus between a defendant and "organized crime." *See* Memorandum of Law in Support of Defendants' Motion to Dismiss at 27–28, Document 12 of the Record. There is some support for this position. *See, e.g., Adair v. Hunt Int'l Resources Corp.,* 526 F.Supp. 736 (N.D.Ill.1981); *Waterman Steamship Corp. v. Avondale Shipyards, Inc.,* 527 F.Supp. 256 (E.D.La.1981); *Barr v. WUI/TAS, Inc.,* 66 F.R.D. 109 (S.D.N.Y. 1975). However, I find more persuasive the cases and commentators taking the contrary view. *See, e.g., Schacht v. Brown,* 711 F.2d 1343, 1353 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 509, 78 L.Ed.2d 698 (1983); *Bennett v. Berg,* 685 F.2d 1053, 1063 (8th Cir.1982), *cert. denied,* —— U.S. ——, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983); *In re Action Industries Tender Offer,* 572 F.Supp. 846, 850–51 (E.D.Va.1983); *Yancoski v. E.F. Hutton,* 581 F.Supp. 88, 96 & n. 18 (E.D.Pa.1983); *Meineke Discount Muffler Shops, Inc. v. Noto,* 548 F.Supp. 352, 354 (E.D.N.Y.1982); *D'Iorio v. Adonizio,*

554 F.Supp. 222, 229–31 (M.D.Pa.1982); Note, *Civil RICO: The Temptation and Impropriety of Judicial Restriction,* 95 Harv.L.Rev. 1101, 1106–09 (1982). I agree with Judge Caldwell that "[r]equiring a nexus with organized crime would be of doubtful constitutionality and would in most cases impose an insuperable barrier to our jurisdiction in RICO matters." *D'Iorio,* 554 F.Supp. at 231; *cf.* Note, *supra,* 95 Harv.L.Rev. at 1107–08 (noting that a number of members of the House of Representatives "feared that any attempt to define the concept of 'organized crime' with the precision necessary to avoid challenges for vagueness would cast doubt on the statute's constitutionality" because it would criminalize membership in certain organizations or create "status offenses"). Accordingly, the court will not require the plaintiffs to show that the defendants are connected to organized crime.

The defendants' third argument designed to support dismissal of the RICO count focuses upon the statutory requirement that "racketeering activity" be involved. Under 18 U.S.C. § 1964(c), "[a]ny person injured in his business or property *by reason of a violation of section 1962* of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c) (emphasis added). Section 1962(c), in turn, provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or

---

5. While the percentage of account values paid in commissions was not provided in connection with the accounts of plaintiffs Louis and Deborah Domiano, the turnover ratios for these accounts have been provided "for the months for which data is available." Complaint ¶ 38, Document 1 of the Record. While the question regarding the Domianos is somewhat closer than it is with respect to the other plaintiffs, the court believes that the inclusion of the turnover ratios, account numbers and other relevant information adequately puts the defendants on notice of the claims presented.

6. The plaintiffs also have alleged that many of the accounts involved a high amount of "same-day" trades. In addition, there are general allegations that "[i]n certain instances" other occurrences, *viz.,* "delivery," "no stop-loss orders" and "inappropriate speading" took place which operated to the plaintiffs' detriment. The court expresses no opinion on the sufficiency of these allegations beyond noting that the plaintiffs' other, more specific claims, preclude the court from dismissing under Rule 9(b).

indirectly, in the conduct of such enterprise's affairs *through a pattern of racketeering activity....* 18 U.S.C. § 1962(c) (emphasis added). "Racketeering activity" has been defined to include, *inter alia,* "any act which is indictable" under the mail and wire fraud statutes, 18 U.S.C. § 1961(1)(B). *Id.* (D). To establish the requisite "pattern" of racketeering activity, a plaintiff must prove the occurrence of "at least two acts of racketeering activity, one of which occurred after the effective date of [RICO] and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).

■ To support their view that the plaintiffs have not sufficiently alleged a pattern of racketeering activity, the defendants assert that the factual allegations contained within the complaint "do not support" the theory that the defendants committed the predicate acts of mail and wire fraud. Memorandum of Law in Support of Defendants' Motion to Dismiss at 29, Document 12 of the Record. The plaintiffs' complaint contains a number of assertions tending to support their belief that the defendants used the mails and wires to carry out the alleged fraudulent scheme described *supra.* Specifically, it is alleged that the defendants mailed monthly statements and other documents to the plaintiffs and used the telephone wires to communicate with the plaintiffs, with other E.F. Hutton employees and between themselves. The court finds these allegations to be sufficient to permit the RICO claim to go forward.[7]

The defendants' final argument pertaining to Count II concerns the nature of the plaintiff's alleged injuries. Under the pertinent section of RICO, a plaintiff must show that his injuries occurred "by reason of" a violation of § 1962, *viz.,* a pattern of racketeering activity. *See* 18 U.S.C. § 1964(c). The defendants assert that "[t]he analysis of most courts considering this issue has focused upon a distinction between the injury alleged to have resulted from the predicate acts of 'racketeering activity,' on the one hand, and the injury alleged to have resulted from the acquisition, establishment, operation, or conduct of the 'enterprise' on the other." Memorandum of Law in Support of Defendants' Motion to Dismiss at 31, Document 12 of the Record. The defendants argue that the court should focus upon the conduct of the enterprise rather than the predicate acts.

Adopting this approach, some courts have held that "a plaintiff must allege not only injury from the predicate offenses, but injury of the type the RICO statute was intended to prevent." *Harper v. New Japan Securities International,* 545 F.Supp. 1002, 1007–08 (C.D.Cal.1982); *accord, Noland v. Gurley,* 566 F.Supp. 210, 218 (D.Colo.1983); *In re Action Industries Tender Offer,* 572 F.Supp. at 850. Some courts have attempted to apply this reading of the statute by requiring a plaintiff to prove that he has suffered a "competitive" injury, *see, e.g., North Barrington Development, Inc. v. Fanslow,* 547 F.Supp. 207, 211 (N.D.Ill.1980), or a "racketeering enterprise" injury, *e.g., Harper,* 545 F.Supp. at 1007, *see, e.g., Landmark Savings & Loan v. Rhoades,* 527 F.Supp. 206, 209 (E.D. Mich.1981).

■ Other courts have rejected the notion that a civil RICO plaintiff must allege that he has suffered a "competitive" or "racketeering enterprise" injury. *See, e.g., Schacht v. Brown,* 711 F.2d at 1356–58; *Bennett v. Berg,* 685 F.2d at 1059; *Mauriber v. Shearson/American Express, Inc.,*

---

7. The defendants also appear to argue that the alleged acts of mail and wire fraud cannot be relied upon to show, in a private RICO action, the requisite pattern of racketeering activity. Specifically, it is asserted:

 There is no private right of action available for violation of the mail and wire fraud criminal provisions.... Given the history of RICO, it was hardly Congressional intention to now create such a private right of action

simply when two acts of mail or wire fraud occurred within a ten-year period.

Memorandum of Law in Support of Defendants' Motion to Dismiss at 30, Document 12 of the Record (citation omitted). The court rejects this argument, for the statute clearly enumerates mail and wire fraud as predicate acts which can form the basis for a finding of a pattern of racketeering activity.

567 F.Supp. 1231, 1239–40 (S.D.N.Y.1983); *Kimmel v. Peterson,* 565 F.Supp. 476, 493–95 (E.D.Pa.1983); *D'Iorio v. Adonizio,* 554 F.Supp. at 230 & n. 5. I agree with this less restrictive approach, for "[t]he requirement of injury by reason of a violation of section 1962 should ... be read as simply requiring that the plaintiff was injured by at least two acts of racketeering activity—a pattern—charged to the defendant." *Yancoski v. Hutton,* at 96. Judge Duffy, of the Southern District of New York, speaking in the context of what some might call a "garden variety" securities fraud case, recently observed:

> An examination of the statute's language reveals no basis for the "racketeering injury" requirement. Part (b), for instance, of section 1962, simply makes it unlawful to conduct the affairs of an enterprise engaged in interstate commerce through a pattern of racketeering injury. A brokerage enterprise infiltrated by organized crime and engaged in defrauding its customers through acts like those alleged here might injure no one but the customers of the enterprise. There would be no injury above and beyond that caused by the predicate acts of fraud forming the "pattern of racketeering activity." Such conduct, however, would violate RICO and would lie near the center of Congress' concern. In addition, § 1964(c) simply provides that "any person ... injured by reason of a violation of section 1962" may invoke RICO's civil remedies. I can imagine no construction of those words which would exclude from their coverage the primary victims of such a scheme and which would render such defendants immune from civil sanctions.
>
> Because the "racketeering injury" requirement seems contrary to the language of the statute and is unsupported in the legislative history, I believe it suffices for plaintiff to allege injury caused by the predicate acts of securities fraud.

*Mauriber v. Shearson/American Express, Inc.,* 567 F.Supp. at 1240–41. I agree with

this reasoning. Accordingly, the motion to dismiss Count II will be denied.

### The Remaining Counts

In Counts III through VII, the plaintiffs seek to recover for alleged breaches of fiduciary duty, civil conspiracy, civil fraud, negligence and breaches of contract. The defendants have moved to dismiss each of these pendent state claims. After carefully considering the defendants' arguments, the court concludes that the complaint sets forth valid causes of action with respect to each of the counts. The court notes that some of the arguments advanced by the defendants would be more appropriately considered on a motion for summary judgment. That, of course, will have to await an expansion of the record.[8] The motion to dismiss will be denied as to Counts III through VII.

Counts VIII and IX of the complaint involve only plaintiffs Jeffrey and Rosaria Elwell and defendants Thomas and Katherine Clark and E.F. Hutton. In Count VIII, the Elwells attempt to state a claim under sections 10(b) and 20 of the '34 Act. These plaintiffs allege that "at various times" they invested approximately $50,000 in securities recommended by the Clarks "in and before December 1979." Complaint ¶ 81, Document 1 of the Record. The Clarks, who possessed total control and managed the Elwells' portfolio, *see id.,* sold "a significant part" of the total investment "between December of 1979 and March of 1980," *id.* ¶ 82. According to the complaint, "other Hutton brokers" also sold portions of the portfolio, although the amount attributable to these "other brokers" as opposed to the Clarks is entirely unclear. *See id.*

As a result of these sales, and notwithstanding "specific instructions to [the] Clarks not to engage in any sale or other transaction that would result in investment losses," *id.* ¶ 84, the Elwells lost $6,000. According to the Elwells, the Clarks acted "with the intent to create commissions for themselves and to further their fraudulent

---

**8.** The court has not considered any of the exhibits submitted by the parties in connection with the motion to dismiss.

scheme and pattern of investment dealings," *id.* ¶ 85. To support their view that the Clarks' conduct violated § 10(b) and that Hutton is liable as a controlling person by virtue of § 20, the Elwells assert that the subject securities were sold "covertly" and "without justification," *id.* ¶ 85A, that the Clarks "failed and refused intentionally to disclose the facts, purpose and terms of the sales," *id.* ¶ 85B, and that the trading was "excessive and unauthorized" and designed to secure "unnecessary and improper commissions," *id.* ¶ 85C.

While the above-quoted allegations may state claims for breaches of fiduciary or contractual obligations, it seems clear that a valid § 10(b) claim has not been stated. "Section 10(b) is aptly described as a catch-all provision, but what it catches must be fraud." *Chiarella v. United States,* 445 U.S. 222, 234–35, 100 S.Ct. 1108, 1117–18, 63 L.Ed.2d 348 (1980). The court observes that the plaintiff may be attempting to state a cause of action based upon purported churning by the Clarks of the Elwells' securities trading account. Such fraudulent conduct ordinarily is actionable under the '34 Act. *See* Discussion of Count I, *supra.* Significantly, however, the pleading does not, with respect to Count VIII, contain the level of specificity required by Rule 9(b). The court cannot determine from the allegations contained in this count that the subject transactions were "excessive in number, judged in relation to the plaintiff's investment objectives and the market conditions at that time." *Baselski v. Paine, Webber, Jackson & Curtis, Inc.,* 514 F.Supp. at 541. There are no facts from which the court can determine "either the turnover ratio of the account, or the percentage of the account value paid in commissions." *Id.* (footnotes omitted). The court will therefore dismiss Count VIII. The plaintiffs will, however, be granted leave to amend to provide more specificity.

Finally, the defendants have moved to dismiss Count IX, which purports to set forth a violation of § 401 of the Pennsylvania Securities Act. The Elwells have opposed the motion only to the extent that they seek leave to amend to set forth other causes of action in lieu of the § 401 claim. The court will grant the defendants' motion to dismiss, but will also grant the Elwells' request for leave to amend. *See* Fed.R. Civ.P. 15(a).

An appropriate Order shall enter.[9]

### ORDER

In accordance with the reasoning set forth in the accompanying Memorandum, IT IS HEREBY ORDERED THAT the defendants' motion to dismiss is denied as to Counts I through VII of the complaint and granted as to Counts VIII and IX of the complaint. The plaintiffs are granted leave to amend the complaint to set forth sufficient allegations in lieu of Counts VIII and IX.

---

9. The court acknowledges that the defendants requested oral argument in connection with their motion to dismiss. However, the parties have extensively briefed the issues involved. The court also has engaged in its own research. In light of the vast material available in connection with the pertinent issues, oral argument would not have been particularly helpful.