**John Paul DECKER, individually and on behalf of all others similarly situated, Plaintiff,**

**v.**

**LANDMARK SAVINGS ASSOCIATION, J. Richard Eshleman, John A. Forbes, Timothy K. Zimmerman, Richard E. Knapp, Ralph H. Burt, Robert F. Gall, Walter C. Langerman, David L. Lloyd, Dennis N. Morr, Paul A. Neely, Patricia P. Olivo, W. Edward Sell, and Robert K. Wagner, Defendants.**

**Carl O. BRUNING, Jr., on behalf of himself and all others similarly situated, Plaintiff,**

**v.**

**LANDMARK SAVINGS ASSOCIATION, J. Richard Eshleman, John A. Forbes, Timothy K. Zimmerman, Richard E. Knapp, Ralph H. Burt, Robert F. Gall, Walter C. Langerman, David L. Lloyd, Dennis N. Morr, Paul A. Neely, Patricia P. Olivo, W. Edward Sell, and Robert K. Wagner, Defendants.**

Civ. A. Nos. 90–639, 90–1027.

United States District Court, W.D. Pennsylvania.

Oct. 23, 1991.

Michael P. Malakoff, Berger, Kapetan, Malakoff & Meyers, P.C., Pittsburgh, Pa., Richard D. Greenfield, Greenfield & Chimicles, Haverford, Pa., for plaintiff John Paul Decker in 90–639 action.

Alfred G. Yates, Jr., Nita M. Fandray, Pittsburgh, Pa., for plaintiff Carl O. Bruning, Jr. in 90–1027 action.

Robert A. King, Mark D. Shepard, Anthony J. Guida, Jr., Buchanan Ingersoll, P.C., Pittsburgh, Pa., for defendants.

## MEMORANDUM ORDER

STANDISH, District Judge.

On April 25, 1990, this case was referred to Chief United States Magistrate Judge Ila Jeanne Sensenich for pretrial proceedings in accordance with the Magistrates Act, 28 U.S.C. Section 636(b)(1)(A) and (B), and Rules 3 and 4 of the Local Rules for Magistrates.

The magistrate judge's report and recommendation, filed on June 12, 1991, recommended that defendants' motion to dismiss be granted. The parties were allowed ten (10) days from the date of service to file objections. Service was made on all parties and objections were filed by plaintiff on June 21, 1991. Defendants filed a response to the plaintiff's objections on July 3, 1991. On September 16, 1991, a supplemental report and recommendation was filed recommending that defendants' motion to dismiss be granted and that plaintiff's motion for leave to amend their consolidated class action complaint be denied. The plaintiffs filed objections to the supplemental report and recommendation on September 26, 1991, and defendants' filed a response to the plaintiffs' objections on October 11, 1991. After *de novo* review of the plead-

ings and documents in the case, together with the report and recommendation, supplemental report and recommendation, and objections thereto, the following order is entered:

AND NOW, this 23d day of October, 1991;

IT IS HEREBY ORDERED that defendants' motion to dismiss is granted and that plaintiffs' motion for leave to amend their consolidated class action complaint is denied.

The report and recommendation of Chief Magistrate Judge Sensenich, dated June 12, 1991, and the supplemental report and recommendation dated September 16, 1991, are adopted as the opinion of the court.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

SENSENICH, Chief United States Magistrate Judge.

### I. RECOMMENDATION

It is recommended that defendants' motion to dismiss be granted.

### II. REPORT

These are consolidated securities actions against Landmark Savings Association ("Landmark") and certain of its officers and directors, filed on behalf of all persons who purchased Landmark common stock during the period of April 20, 1987 through March 20, 1990.[1] The consolidated amended class action complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Act"), 15 U.S.C. Section 78j(b) and Section 78t(a) ("Section 10(b)" and "Section 20(a)" respectively), and Sec. Rule 10b–5, 17 C.F.R. Section 240.-10b–5 ("Rule 10b–5"), in that defendants intentionally concealed Landmark's true financial condition in order to inflate the price of its stock. Plaintiffs amended their complaint in response to defendants' first motion to dismiss. Defendants then filed a motion to dismiss plaintiffs' amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) claiming that the complaint fails to state a claim upon which relief can be granted and fails to plead fraud with particularity.

This case appears to be based on the fact that the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA) which was signed on August 9, 1989, and became effective on December 7, 1989, imposed new capital standards on savings associations like Landmark. When the new Act went into effect Landmark did not meet all the capital standards imposed by the Act. In addition, the Act required Landmark to change the manner in which it accounted for goodwill on its books. The complaint reveals that defendants notified Landmark's shareholders and the public of their concern about satisfying the requirements of FIRREA before it passed and that they announced that Landmark would not be in compliance with the Act even before the effective date of the Act. Mismanagement does not violate the Securities Exchange Act and plaintiffs have not alleged facts sufficient to support a finding of fraud on the part of the defendants.

Plaintiffs allege that during the class period defendants made material misrepresentations in the annual reports and in various written statements about Landmark's capitalization, earnings, assets and management controls. Then, in March of 1990, defendants suddenly announced a write-off of over $42,000,000.00 attributable to the reclassification of assets and a substantial increase in its non performing loans.

The standard for considering a motion to dismiss under Rule 12(b)(6) is that "factual allegations of the complaint are to be accepted as true and the complaint should be dismissed only if it appears to a certainty that no relief could be granted under any set of facts which could be proved. Reasonable factual inferences will be drawn to aid the pleader." *D.P. Enterprises v. Bucks County Community College*, 725 F.2d 943, 944 (3d Cir.1984).

---

**1.** Although the parties refer to this action as a class action, plaintiffs have not yet filed a motion for class certification.

Under Rule 9(b)[2] allegations of fraud must be plead with particularity. In *Christidis v. First Pennsylvania Mortgage Trust*, 717 F.2d 96 (3d Cir.1983), the court held that the district court had properly dismissed prior to discovery for failure to allege fraud with the specificity required by Rule 9(b). The plaintiff was seeking money damages on behalf of a class of purchasers of shares of the trust. The complaint alleged that the defendants' financial statement understated the reserves which the Trust should have accrued for bad debts in violation of the anti-fraud provisions of several federal securities acts. The Court of Appeals discussed the history of Rule 9(b) and the requirements for pleading fraud under the rule.

> Historically, Rule 9(b) is derived from English Common Law Practice.... As Judge Clark noted:
>
>> [i]t has been the rule under both Common Law and Code Pleading that allegations of fraud must be made with a great degree of particularity. Thus, it is said that the elements of fraud in an action for false representation are five, as follows:
>>
>> (1) a specific false representation of material facts;
>>
>> (2) knowledge by the person who made it of its falsity;
>>
>> (3) ignorance of its falsity by the person to whom it was made;
>>
>> (4) the intention that it should be acted upon; and
>>
>> (5) the plaintiff acted upon it to his damage.
>
> C. Clark, Code Pleading Section 48, at 312 (2d Ed.1947). It is the identification of these elements of a fraud claim which the first sentence of Rule 9(b) requires. The rule applies not only to fraud actions under federal statutes, but to fraud claims based on state law. In applying the first sentence of Rule 9(b) courts must be sensitive to the fact that its application, prior to discovery, may permit sophisticated defrauders to success-

fully conceal the details of their fraud. Moreover, in applying the rule, focusing exclusively on its "particularity" language "is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules."

*Id.* at p. 99–100. In that case the court held that the complaint did not satisfy the requirements of Rule 9(b) because it did not disclose the manner in which, in establishing reserves for bad debts in the financial statements relied on, the defendants had knowingly departed from reasonable accounting practices. The defendant's estimates could be fraudulent only if, when they were established, the responsible parties knew or should have known that they were derived in a manner inconsistent with reasonable accounting practices.

The sections of the Act which plaintiffs maintain defendants have violated provide as follow:

**Section 78j. Manipulative and Deceptive Devices.** It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange— ... (b) to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**Section 78t. Liability of Controlling Persons.**

A. Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the con-

---

**2.** "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, in- tent, knowledge and other condition of mind of a person may be averred generally." Federal Rule of Civil Procedure 9(b).

trolling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation of cause of action.

In *Peil v. Speiser,* 806 F.2d 1154 (3d Cir.1986), the court noted that a plaintiff bringing an action under Section 78j must establish six elements which had traditionally been required under the common law tort action of deceit.

To prevail in such an action, a plaintiff had to establish six elements: (1) a false representation of; (2) a material; (3) fact; (4) defendant's knowledge of its falsity and his intention that plaintiff rely on it; (5) the plaintiff's reasonable reliance thereon; and (6) his resultant loss.

*Id.* at p. 1160.

In *Vt Investors v. R & D Funding Corporation,* 733 F.Supp. 823, 828 (D.N.J. 1990), the court identified the significant elements the plaintiff must allege in a complaint to maintain a Rule 10b–5[3] violation.

In this jurisdiction the significant elements of a Rule 10b–5 violation are (1) a material misrepresentation; (2) a purchase or sale of a security; (3) scienter on the part of the defendant who made the misrepresentation; and (4) that the misrepresentation be made "in connection with" the purchase or sale of a security. *Angelastro v. Prudential–Bache Securities, Inc.,* 764 F.2d 939, 942 (3d Cir.), *cert. denied,* 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985).

In *Craftmatic Securities Litigation v. Kraftsow,* 890 F.2d 628 (3d Cir.1990), a class action in which plaintiff John P. Decker was a named plaintiff, the court affirmed dismissal of the complaint as to some claims, reversed dismissal as to others, and gave the plaintiffs an opportunity to amend as to others. The plaintiffs were a class comprised of all persons who had purchased stock during the period from March 5, 1986 to June 11, 1987. They alleged that they purchased the securities based on documents that allegedly misrepresented or omitted material information. The court noted that in *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), the Supreme Court held that acts of corporate mismanagement do not violate Section 10(b) or Rule 10b–5 in the absence of deception, misrepresentation, or nondisclosure. Referring to *Santa Fe* the court stated:

[A] breach of fiduciary duty, unaccompanied by misrepresentation, nondisclosure, or deception, does not violate the statute or the rule ... Congress did not intend § 10(b) to regulate 'transactions which constitute no more than internal corporate mismanagement.' "

*Id.* at 638. The court added:

[W]e must be alert to ensure that the purpose of *Santa Fe* is not undermined by 'artful legal draftsmanship'; claims essentially grounded on corporate mismanagement are not cognizable under federal law.

*Id.* at 638–639. Since the prospectus provided an accurate and reasonably detailed account of past operations and complete financial statements, the concerns underlying the Securities Act were not implicated simply because management had failed to characterize:

(1) Its new product research and other studies as meaningless (¶ 49(f) of the complaint).

(2) Itself is unfocused and unable to manage its businesses (¶ 49(i) of the complaint).

(3) Its costs as "out of control" and its costs controls as ineffective (¶ 49(j) of the complaint).

(4) Its financial reporting and accounting controls as inadequate and ineffective (¶ 49(k) of the complaint).

---

**3. Employment of manipulative and deceptive devices.** It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

(5) Its "information systems" as "wholly inadequate" (¶ 49(*l*) of the complaint).

Therefore the court affirmed its dismissal of these claims.

The court reversed the dismissal of plaintiffs' allegations that the prospectus failed to disclose facts material to the evaluation of the offered security such as:

(1) The success of the advertising, promotion, and marketing program depended on deceptive, illegal practices (¶ 49(a) of the complaint).

(2) The program violated various consumer protection laws and consent orders entered into between Craftmatic and federal and state governments (¶ 49(b) and (c) of the complaint).

(3) The program resulted in abnormally high level of consumer complaints (¶ 49(h) of the complaint).

(4) Despite its entry into consent orders resulting from the company's advertising and marketing activities, Craftmatic misrepresented its chairs as "custom-fitted" (¶ 49(n) of the complaint).

The court found that if the plaintiffs could prove these facts, a jury could conclude that the prospectus failed to disclose material facts necessary to make the disclosed material statements not misleading in violation of Sections 11(a), 12(2) and Rule 10b-5.

The court found that the following allegedly omitted predictions would have been sufficiently speculative and unreliable to be immaterial as a matter of law and affirmed their dismissal:

(1) The documents were materially false and misleading in that they failed to disclose that the success of Craftmatic's advertising and marketing program was dependent on deceptive, illegal sales practices that would and did result in serious charges being brought against Craftmatic. (¶ 49(a) of the complaint).

(2) The documents were materially false and misleading in that they failed to disclose that Craftmatic's rapid expansion program entailed an unusual and extremely high risk of failure, particularly in connection with its development of new product lines and its acquisition and/or resale of distributorships, and that, in embarking upon its abnormally speculative venture, the company was essentially gambling with its profitability. (¶ 49(d) of the complaint).

(3) The documents were materially false and misleading in that they failed to disclose that Craftmatic's application of the advertising and marketing strategies of its core bed and chair business to new product lines entailed enormous costs that would far outstrip the revenues generated by the new product lines and hurt the company's profitability. (¶ 49(e) of the complaint).

(4) The documents were materially false and misleading in that they failed to disclose that in order to report increases in total net sales, Craftmatic required an ever increasing number of distributorships in uncertain marketing territories, as well as commensurate increases in promotional costs and expensive print and electronic media advertising expenditures, without which Craftmatic's total net sales would stagnate or decline. (¶ 49(g) of the complaint).

(5) The documents were materially false and misleading in that they failed to disclose that Craftmatic's rate of growth in its core bed and chair business was not sustainable. (¶ 49(m) of the complaint).

(6) The documents were materially false and misleading in that they failed to disclose that Craftmatic's water purification and security shutter product lines were not amenable to being marketed successfully by the in-home direct sales techniques and were developed for the company's core bed and chair business. (¶ 49(p) of the complaint).

The court recognized that application of Rule 9(b) prior to discovery "may permit

sophisticated defrauders to successfully conceal the details of their fraud," (645). The court noted that Rule 9(b) had been relaxed when factual information was peculiarly within the defendant's knowledge or control. However, the court stated, "Even under a non restrictive application of the rule, pleaders must allege that the necessary information lies within defendant's control, and their allegations must be accompanied by a statement of the facts upon which the allegations are based." (*Id.* at 645). The court added:

> However, plaintiffs must accompany their allegations with facts indicating why the charges against defendants are not baseless and why additional information lies exclusively within defendant's control.

*Id.* at 646.

Plaintiffs' claims that defendants artificially inflated Landmark's share price fit into two general categories. First, they claim that defendants concealed and failed to disclose that they made increasingly risky commercial business and residential loans for which they failed adequately to reserve against loss. Second, they allege that defendants concealed Landmark's precarious financial condition by exaggerating its earnings, assets and net worth and concealing the fact that it was undercapitalized.

■ Paragraphs 31 and 52 of the complaint address defendants' alleged concealment and failure to disclose that they made increasingly risky commercial business and residential loans for which they failed adequately to reserve against loss. Paragraph 31 alleges as follows:

> In 1986, the individual defendants caused Landmark to embark on an aggressive campaign to promote its publicly traded securities to the investing public and artificially inflate or maintain Landmark's share prices, by concealing and failing to disclose Landmark's inadequate capitalization, its risky commercial business and residential real estate loan portfolios, its precarious financial condition, and otherwise to exaggerate its earnings, assets and net worth. The campaign included Landmark's declaration of dividends, which payments were not justifiable under the circumstances. Defendant Eshleman falsely or with reckless regard for the truth touted Landmark's strong financial condition in a letter to shareholders disseminated in March, 1987:

> For the first time in Landmark's history as a public company we paid a dividend to our shareholders. The dividend of five cents per share was declared in every quarter commencing in April of 1986. I believe the dividend symbolizes the Board's confidence in the inherent financial strength of Landmark.

> One of the major concerns of federal regulators is the undercapitalization of the savings and loan industry. It's a concern we at Landmark share because the stronger the industry, the more attractive our stock becomes. While this industry problem did not directly affect Landmark, we still felt that if we were to grow and be able to take advantage of further opportunities, our capital position should be enhanced.

Plaintiffs do not identify any specific information defendants allegedly concealed and failed to disclose relating to Landmark's alleged inadequate capitalization. They do not identify the way in which Landmark's commercial business and residential real estate loan portfolios were risky. They do not identify how defendants exaggerated Landmark's earnings assets and net worth. They provide no factual basis for their claim that dividend payments were not justifiable under the circumstances. These claims are similar to the claims alleged in paragraphs 49(d), (e), (q), (m) and (p) of *Craftmatic, supra,* which the Court of Appeals held had been properly dismissed. While these claims might support a claim of mismanagement by defendants, *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), recognized that mismanagement is not a basis for a federal claim.

Paragraph 52 of the complaint alleges:

Throughout the Class Period, the representations that Landmark's assets, earnings and net worth were appropriately recorded on its books and that it was adequately capitalized were false and misleading. In fact, contrary to the defendants' representations and statements, throughout the Class Period, Landmark's assets, earnings and net worth were overstated, and Landmark was under capitalized. Moreover, during the Class Period, defendants' zeal for expansion caused Landmark to extend imprudent and commercially unreasonable loans, for which Landmark failed to adequately reserve against loss. The balance of non-performing business loans increased by approximately 260% during the two year period, ending December 31, 1989. This increase, which constituted 44% of all non-performing loans in that period, was concentrated in five large loans which together made up 80% of total non-performing commercial business loans.

Plaintiffs allegations are broad and conclusory and lack factual support. As to plaintiffs' claim that Landmark failed to adequately reserve against loss, it is noted that in *Christidis, supra,* the court held that the plaintiff's claim that the defendants' financial statements understated the reserves which the trust should have accrued for bad dates did not sufficiently allege fraud with the specificity required by Rule 9(b) and was properly dismissed.

In *DiLeo v. Ernst & Young,* 901 F.2d 624 (7th Cir.1990), the plaintiffs brought an action against Continental Illinois Bank's accounting firm. The plaintiffs contended that the accountants violated the securities laws by certifying fraudulent financial statements of the bank and by aiding and abetting the bank's violations of the securities laws. Although this action was not against the bank directly, the court discussed whether or not the bank's financial trouble in the 1980's was caused by fraudulent action. The court stated that the gist of the plaintiffs' complaint was that the bank had failed to establish sufficient reserves to cover the ever larger volumes of non-performing loans. The court stated

that the securities laws do not protect investors against reverses and that the plaintiffs had failed to show how the failure to increase the reserves amounted to "fraud." The court referred to the complaint to show how it failed to meet the specificity requirements of Rule 9(b):

> Paragraph 46(c) is the closest the complaint approaches to specificity:
>
> (i) At Annual Report page 22, provisions for credit losses were stated at $492 million which failed to reflect the material amounts of credits for which reserves should have been taken, in additional amounts of at least $600 million.
>
> (ii) At page 22, net credit losses of $393.2 million were materially understated by approximately $4 billion in bad loans.
>
> (iii) At page 22, nonperforming loans were reported at approximately $1.9 billion which materially understated the amount of loans which were not performing or which had been restructured to give the illusion that they were currently meeting obligations ...

*Id.* at p. 626. The court found that the complaint did not include a single, concrete example of fraud and failed to state who, what, when, where, and how as required by Rule 9(b). The court further stated:

> The story in this complaint is familiar in securities litigation. At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud. "Must be" is the critical phrase, for the complaint offers no information other than the differences between the two statements of the firm's condition. Because only a fraction of financial deterioration reflects fraud, plaintiffs may not proffer the different financial statements and rest. Investors must point to some facts suggesting that the difference is attributable to fraud.

*Id.* at p. 627.

■ Paragraph 53 of plaintiff's amended complaint alleges the following:

Landmark's precarious and undisclosed financial condition placed it out of compliance with the federal capital requirements of FIRREA, and subjected it to various sanctions and penalties, including the possibility of the appointment of a conservator, the assessment of daily fines, termination of deposit insurance, and other sanctions, thereby injuring its financial operations.

This paragraph appears to allege that Landmark was subjected to the *possibility* of various sanctions by reason of the fact that it was not in compliance with the federal capital requirements of FIRREA. However, this paragraph does not allege any specific misrepresentations and does not sufficiently allege fraud.

■ Plaintiffs' remaining claims are included under the broad category of concealment of Landmark's precarious financial condition by exaggerating its earnings, assets and net worth and concealing the fact that it was undercapitalized. The claim that it was undercapitalized, as has already been noted, appears to have been based upon the fact that it did not meet the requirements for capitalization under FIRREA which went into effect on December 7, 1989. Plaintiffs have not alleged any specific facts which should have put any of the defendants on notice that Landmark was undercapitalized, other than a change in the law. The complaint actually reveals that prior to enactment of FIRREA defendants realized the new act was likely to increase Landmark's capital requirements, that action would have to be taken to attempt to comply with the Act and that the public and stockholders were so notified. In paragraph 43 of the complaint plaintiffs allege that in its Form 10Q Report for the quarter ending on March 31, 1989, which was signed by defendants Eshleman and Zimmerman, Landmark reported that its assets at March 31, 1989, represented $1.8 billion, and because of its proper capitalization it expected to "be able to comply with the new more stringent requirements" to be imposed by federal legislation. Plaintiffs allege "given what the defendants knew or should have known with respect to the 'quality' of its capitalization, such state-

ment was either knowingly false or made with reckless disregard for the truth." Defendants were merely referring to anticipated legislation and their expectation that they would be able to comply with the new requirements. Plaintiffs fail to allege any facts supporting their conclusion that this statement was either knowingly false or made with reckless disregard for the truth. Defendants admitted they would have to take affirmative action to comply with the pending legislation.

Paragraph 44 of the amended complaint alleges that in its Form 10Q report for the quarter ending on June 30, 1989, which was signed by defendants Eshleman and Zimmerman, Landmark reported that its assets at June 30, 1989, represented $1.8 billion and that Landmark continued to represent falsely that it was adequately capitalized as follows:

Landmark's regulatory capital requirement as of June 30, 1989 was approximately $50.8 million. Regulatory capital at June 30, 1989 totalled $92.5 million, exceeding the minimum regulatory capital requirement by $41.7 million.

New capital requirements currently being finalized by a Congressional conference committee will most likely significantly increase the amount of regulatory capital required for all thrift institutions. The new capital requirements are expected to be comprised of three components. Institutions would be required to maintain core capital of at least 3% of total assets, maintain tangible capital (regulatory capital less supervisory goodwill) of 1.5% of total assets, and meet a risk-based capital standard. During the past several months, Landmark has been closely monitoring the developments of the new legislation. The Association has implemented some specific measures to improve its capital position and is studying others which management believes will achieve compliance with the new capital requirements.

Plaintiffs do not challenge the actual facts and figures defendants gave in the report and do not assert contrary figures. Defendants admitted in the report that they

would have to take affirmative action to comply with the pending legislation.

Plaintiffs allege in paragraph 45 that on October 2, 1989, defendant Eshleman shocked the investment community when he publicly announced that Landmark was not in compliance with the capital requirements under FIRREA. It is noted that plaintiffs allege the class period extended from April 20, 1987 to March 20, 1990, although the complaint specifically alleges that on October 2, 1989, prior to the effective date of FIRREA, on December 7, 1989, defendant Eshleman publicly announced that Landmark would not be in compliance with the capital requirements of FIRREA.

Paragraph 46 of the amended complaint alleges that after OTS published its final rules on capital standards on November 9, 1989, Landmark announced a new "policy of *moderate asset* shrinkage in connection with an overall plan to meet the more stringent capital requirements included in FIRREA." Plaintiffs' complaint therefore reveals that during the class period defendants publicly announced the action they were taking to attempt to comply with the new capital requirements.

Paragraph 47 of the amended complaint alleges that on December 22, 1989 (during the class period) Landmark publicly announced it was not in compliance with the newly finalized federal capital requirements and that its noncompliance could have a significant effect on dividends. Defendant Eshleman announced that while the OTS reviewed Landmark's new capital plan, new federal regulations would "restrict asset growth and payment of dividends, and the regulators could require similar restrictions in the capital plan." This allegation does not support a claim of fraud.

In paragraph 48 plaintiffs allege that defendant Eshleman revealed that Landmark's ability to pay dividends was significantly and adversely affected by its noncompliance with the federal capital requirements as follows:

We have applied for approval to continue dividend payments, although there is no assurance it will be granted or that a response will be received prior to the next regular dividend payment date.

This allegation does not support a claim of fraud.

Paragraph 49 of the amended complaint alleges that when Landmark filed its Form 10–K in March 1990 for the year ended December 31, 1989, to the market's surprise Landmark reported that its classified or problem assets totalled $25.3 million, of which $23.7 million represented assets classified substandard, 336,000 represented assets classified doubtful, with the remaining $1.3 million classified loss. Plaintiffs allege that according to this report this amount "was primarily attributable to increases in non performing commercial business loans and residential real estate loans." Plaintiffs allege no facts which would support a finding of fraud.

Paragraph 50 of the amended complaint alleges that on March 20, 1990, the ending date of the alleged class, defendant Eshleman announced that Landmark would write off $42.6 million and restate its income for 1989 as a loss of $38.1 million. Plaintiffs allege that Landmark had previously reported a profit of $4.5 million or $1.90 per share for 1989. Plaintiffs allege that the write off and loss were attributable to the intangible assets carried wrongfully as good will on Landmark's books since 1982. They allege that defendant Eshleman further announced that Landmark had suspended payment of quarterly dividends. The complaint itself reveals that these actions resulted from the change in federal law as a result of FIRREA and that defendants had been giving notice since March 31, 1989 of its need to take affirmative action to comply with the proposed legislation as it seemed to be developing. Plaintiffs have provided no factual basis for a finding that any of the defendants are guilty of fraud.

■ In paragraphs 23 and 35 of the amended complaint, plaintiffs allege that defendants improperly amortized and retained as an asset millions of dollars in purported "goodwill" which was not recoverable from operations. The section of the 1987 annual report quoted in paragraph 35

of the complaint admitted that the excess of cost over net assets acquired, or goodwill, was a challenge for Landmark. It was admitted that it was a non earning asset that forced Landmark to work harder to give its shareholders an attractive rate of return. Plaintiffs have offered no factual basis for a conclusion that prior to the effective date of FIRREA it was improper to carry "goodwill" on Landmark's books as an asset. In *Christidis, supra,* in affirming the dismissal of the complaint the court stated:

> [The complaint's] defect is the complete absence of any disclosure of the manner in which, in establishing reserves for bad debts in the financial statements relied upon, the defendants *knowingly departed from reasonable account practices .... [The reserves] could be fraudulent only if, when they were established, the responsible parties knew or should have known that they were derived in a manner inconsistent with reasonable accounting practices.*

717 F.2d at 100. (Emphasis added). Plaintiffs' challenge to Landmark's treating goodwill as an asset appears to be based on the fact that it could no longer do so after the effective date of FIRREA. A change in law does not support a claim of fraud. The 1987 annual report specifically told shareholders and the public that Landmark was carrying goodwill as a non earning asset. Therefore the complaint does not allege a factual basis for a claim of fraud.

In paragraph 32 of the amended complaint plaintiffs allege:

> Spurred on by Landmark's management and the need to maximize reported profits, defendants continued to tout the quality of Landmark's assets and its strong capitalization in its Form 10–K Report in March, 1988.
>
> > Under the new regulation (published by the FHLLB on December 21, 1987, under the Competitive Equality Banking Act of 1987, Landmark's) substandard assets totalled $19.8 million ... (Landmark) has no assets classified as doubtful or loss at December 31, 1987 and 1986.

Plaintiffs have identified no assets which they claim defendants should have classified as doubtful or loss at December 31, 1987 or 1986.

Paragraph 33 of the amended complaint alleges:

> Continuing to portray Landmark in a falsely optimistic manner, defendant Eshleman's letter to shareholders in Landmark's 1987 Annual Report, released in or about March, 1988, stated:
>
> > Landmark's earnings for 1987 were $7.1 million, or $2.90 per share, as compared to $5.2 million, or $2.70 per share, for 1986 ...
> >
> > In keeping with our excellent operating results, Landmark paid a cash dividend on its common stock for each quarter of 1987 ...
> >
> > Asset quality remained excellent and considerably better than the national average for the savings and loan industry.

Plaintiffs have alleged no facts which would establish that defendant Eshleman's letter contained known misrepresentations at the time it was made.

Paragraph 34 of the amended complaint alleges that in his letter in Landmark's 1987 Annual Report defendant Eshleman stated:

> The savings and loan industry and its well-managed institutions became blemished in 1987 by the closures of a number of thrifts and the need to recapitalize the FSLIC. For Landmark this is particularly frustrating because, as our shareholders can see, we are profitable, financially sound and have excellent potential for growth. But Landmark's stock is caught in the morass of our industry's poor image brought about by a few savings and loan failures and sensational headlines. We have been victimized by circumstances over which we have no control.

This letter would appear to give potential investors notice that Landmark was facing problems which could result in loss of stock value.

Paragraph 36 of plaintiff's amended complaint alleges:

In his letter to Landmark's shareholders in the Landmark's 1988 Annual Report, released in or about March, 1989, Defendant Eshleman falsely advised shareholders that Landmark had celebrated its "best year ever, in spite of the crisis that was rocking the thrift industry" and that Landmark was "rock solid and well positioned for the future."

Plaintiffs have alleged no facts which would provide a basis for finding these statements to have been untrue when they were made. Plaintiffs allege in paragraph 37 of the amended complaint that:

Landmark's 1988 Annual Report further represented falsely that Landmark was in healthy economic condition and well managed:

The most gratifying aspect of 1988 is that earnings were the highest since the Association's inception. 1988 also represented the fourth consecutive year of improved earnings. These results were accomplished by doing the things a well-managed financial institution should do: increase deposits, make quality loans, reduce exposure to escalating interest rates and control expenses. (Annual Report, p. 20)

Plaintiffs have alleged no facts which would provide a basis for finding that any of the statements in this annual report were known to be false when they were made.

Paragraphs 38 and 52 of the amended complaint allege that in the 1988 Annual Report and throughout the class period, defendants represented that Landmark's management had in place reasonable internal control systems with respect to the recording of transactions on Landmark's books and that these representations were false and misleading. In paragraph 52 of the amended complaint, plaintiffs allege:

In fact, contrary to the defendants' representations and statements, throughout the Class Period, Landmark's assets, earnings and net worth were overstated, and Landmark was under capitalized. Moreover, during the Class Period, defendants' zeal for expansion caused Landmark to extend imprudent and commercially unreasonable loans, for which Landmark failed to adequately reserve against loss. The balance of non-performing business loans increased by approximately 260% during the two year period, ending December 31, 1989. This increase, which constituted 44% of all non-performing loans in that period, was concentrated in five large loans which together made up 80% of total non-performing commercial business loans.

As has already been noted, the only specific instances of Landmark's allegedly failing appropriately to record assets earnings and net worth on its books were the changes required by FIRREA. It had to stop carrying goodwill as an asset and after adoption of that act Landmark was undercapitalized. The complaint reveals that defendants had admitted these potential problems prior to the effective date of FIRREA.

In paragraph 39 of the amended complaint, plaintiffs allege:

Furthermore, the 1988 Annual Report described Landmark's assets of $1.8 billion as of December 31, 1988, as representing an "increase of $183.3 million or 11.1% from December 31, 1987." (Annual Report, p. 24)

Plaintiffs do not challenge this statement as factually untrue at the time it was made.

Paragraph 40 of the amended complaint alleges as follows:

In addition, the 1988 Annual Report represented the following with respect to Landmark's earnings per share and dividends per share on its common stock:

|  | 1988 | 1987 |
|---|---|---|
| Earnings | $ 3.68 | $ 2.90 |
| Dividends | .28 | .20 |
| Book Value/Share | 34.59 | 31.58 |

Plaintiffs have offered no factual basis for concluding that the defendants had reason to believe the above figures were not true at the time the report was prepared.

In paragraph 41 of the amended complaint plaintiffs allege that "Defendants continued to condition the market to believe that Landmark was maintaining regulatory capital requirements. In fact, in the 1988 Annual Report, Landmark represented

falsely that it was *more* than adequately capitalized." However, the section of the report plaintiffs quote merely states that Landmark had regulatory capital of $90.4 million at December 31, 1988, which exceeded the regulatory capital requirement by approximately $37.8 million. Plaintiffs have offered no factual basis for concluding that the figures defendants gave were false at the time they were given or that defendants did not have reason to believe at that time that Landmark's regulatory capital exceeded the regulatory capital requirement by approximately $37.8 million.

In paragraph 42 of the amended complaint plaintiffs allege:

> In the 1988 Annual Report, Landmark represented that it had "consistently maintained high asset quality ..." (Annual Report, p. 27). However, at that same time, and throughout the Class Period, Landmark's list of non-performing assets was growing rapidly.

Plaintiffs have not identified the list of non-performing assets which they claim was growing rapidly at that time and the percentage of non-performing assets to other assets.

Paragraph 55 of the amended complaint, as follows, is extremely conclusory:

> Throughout the Class Period, defendants trumpeted their apparently positive operating results and their purportedly conservative banking practices while down playing their problems. Defendants issued many public statements and reports, including financial statements and other reports, releases and statements as described which were materially false and misleading in violation of Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder. The reports, releases, and statements were materially false and misleading in that they failed to disclose material adverse information about the veracity of Landmark's reported assets, earnings and net worth, and its inadequate capitalization.

█ Complaints alleging fraud cannot rely on notice pleading. Plaintiffs' amended complaint, which was filed in response to defendants' first motion to dismiss, does

not allege a factual basis for securities fraud as required by Third Circuit law. Therefore, it is recommended that defendants' motion to dismiss be granted.

In accordance with the Magistrates Act, 28 U.S.C. Section 636(b)(1)(B) and (C), and Rule 4 of the Local Rules for Magistrates, the parties are allowed ten (10) days from the date of service to file objections to this report and recommendation.

Dated: June 12, 1991

## MAGISTRATE JUDGE'S SUPPLEMENTAL REPORT AND RECOMMENDATION

### I. RECOMMENDATION

It is recommended that defendants' motion to dismiss be granted and that plaintiffs' motion for leave to amend their consolidated class action complaint be denied.

### II. REPORT

On June 12, 1991, a report and recommendation was filed recommending that defendants' motion to dismiss be granted. Objections were filed by plaintiffs and subsequently they asked the court to consider the recent Supreme Court decision, *Virginia Bankshares, Inc. v. Sandberg*, —— U.S. ——, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991), and deny defendants' motion to dismiss. Therefore an order was entered on July 12, 1991, requiring the parties to file briefs by July 26, 1991, addressing the applicability of *Virginia Bankshares* to this case. Both parties filed briefs and on August 9, 1991, plaintiffs filed a motion for leave to amend their complaint.

*Virginia Bankshares* does not help plaintiffs. In that case the court was considering a claim for damages pursuant to Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. Section 78n(a), to which Rule 9(b) does not apply. Further, in this case plaintiffs' complaint does not reveal the factual basis for plaintiffs' conclusions that defendants' challenged statements were intentionally false and misleading. Therefore, it is again recommended that defendants' motion to dismiss be granted.

Plaintiffs seek leave to amend their consolidated class action complaint for the second time. Their first amendment was in response to defendants' first motion to dismiss. Plaintiffs' proposed amended consolidated class action complaint does not cure the deficiencies of the first amended consolidated class action complaint. It does not allege specific facts in support of their conclusion that defendants intentionally made material misrepresentations about Landmark's commercial business and residential loans and Landmark's financial condition. Therefore, it is recommended that plaintiffs' motion for leave to amend their consolidated class action complaint be denied.

In accordance with the Magistrates Act, 28 U.S.C. Section 636(b)(1)(B) and (C), and Rule 4 of the Local Rules for Magistrates, the parties are allowed ten (10) days from the date of service to file objections to this report and recommendation.

Dated: September 16, 1991