# In re WELLS FARGO SECURITIES LITIGATION.

**Howard GREENWALD; Milton Friedman; Sheldon Shore; John Paul Decker; Fairmont Financial Corporation; Arthur–Magna Inc; Harold Bloch; Robert C. Schilling, on behalf of themselves and all others similarly situated, Plaintiffs–Appellants,**

**v.**

**WELLS FARGO & CO., a Delaware Corporation; Carl E. Reichardt; Paul Hazen; Robert L. Joss; Clyde Ostler; David M. Petrone; William F. Zuendt; Stephen A. Enna; Rodney L. Jacobs; Patrick W. Leahy; Guy Rounsaville, Jr., Defendants–Appellees.**

No. 92–15344.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 10, 1993.

Decided Dec. 29, 1993.

address the question of whether cohabiting abuse is a crime of moral turpitude.

**924**

William S. Lerach, Milberg, Weiss, Bershad, Hynes & Lerach, San Diego, CA, and Elizabeth Joan Cabraser, Lieff, Cabraser & Heimann, San Francisco, CA, for plaintiffs-appellants.

Melvin R. Goldman, Morrison & Foerster, San Francisco, CA, for defendants-appellees.

Before: REINHARDT, TROTT, and RYMER, Circuit Judges.

RYMER, Circuit Judge:

Purchasers of Wells Fargo & Co. common stock ("shareholders") appeal from the district court's order dismissing their securities fraud class action with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] In their Amended Complaint, the shareholders allege that Wells Fargo & Co. and certain of its senior officers and directors (collectively "Wells Fargo") violated § 10(b) of the Securities Exchange Act of 1934 (" '34 Act"), 15 U.S.C. § 78j(b); the SEC's Rule 10b-5, 17 C.F.R. § 240.10b-5; § 20 of the '34 Act, 15 U.S.C. § 78t; and California Civil Code §§ 1709–10 by fraudulently withholding material information and by issuing a series of false and misleading statements relating to the level of loan loss reserves maintained by Wells Fargo & Co.'s banking subsidiary, Wells Fargo Bank.[2] The shareholders claim that these omissions and misrepresentations served to inflate artificially the trading price of Wells Fargo & Co. stock, thus causing financial injury to those who purchased the overpriced shares. We have jurisdiction under 28 U.S.C. § 1291, and we reverse.

I

On June 25, 1991, Wells Fargo & Co. issued a statement that Wells Fargo Bank would recognize $180 million in actual loan losses for the second quarter ending June 30, 1991, and that the Bank expected to add approximately $350 million to its loan loss reserves for that same period. Wells Far-

---

1. Although the district court mentioned Fed. R.Civ.P. 9(b) in its opinion, both sides agree that it did not rely on Rule 9(b) in ordering dismissal.

2. In dismissing the shareholders' cause of action under § 10(b) and Rule 10b-5, the district court did not reach the merits of either the shareholders' § 20 claim or their California state law claims for fraud and negligent misrepresentation. Accordingly, the propriety of the district court's dismissal of the shareholders' claim for relief under § 10(b) and Rule 10b-5 is the only issue on appeal.

go's disclosure precipitated a sharp drop in the trading price of its stock—from a pre-announcement high of $97 per share to $74 per share. Shareholders who purchased Wells Fargo stock between March 5, 1991, when the company issued its 1990 Annual Report to Shareholders and filed its Form 10–K with the SEC, and June 25, 1991, the date that Wells Fargo disclosed that it would increase loan loss reserves for the second quarter, filed their amended class action complaint on August 26, 1991.

The theory of securities fraud advanced by the shareholders' Amended Complaint is that Wells Fargo maintained the inflated trading price of its common stock by failing to disclose the status of certain loans that it knew were in jeopardy. More specifically, the shareholders allege that senior directors and officers of Wells Fargo, motivated by the desire to "continue and prolong the image of Wells Fargo as a well-managed enterprise with sound lending procedures" and thus, maximize their individual compensation, the value of their personal Wells Fargo & Co. stock holdings, and their job security, became aware in March 1991 that the Bank's commercial, real estate, and highly leveraged loan portfolios had been mismanaged, were "not fundamentally sound and [were] prone to non-repayment in foreseeable and predictable economic downturns." Nonetheless, according to the shareholders, Wells Fargo was able to maintain the high value of its stock "through the issuance of materially false and misleading reports filed with the SEC, annual and quarterly reports to shareholders, releases to the public and financial statements," all intended to conceal "how poorly Wells Fargo had been managed by the Individual Defendants and how badly its financial and operating condition had deteriorated." Primary among Wells Fargo's alleged methods of deception was a deliberate understatement of loan loss reserves,[3] effected through Wells Fargo's failure timely to recognize known problem loans and failure to adjust loan loss reserves "at an appropriate level consistent with the [known] risk of loss actually faced."

3. The Amended Complaint states that banks charge each quarter's provision for loan losses against current net income, thus reducing earn-ings per share in an amount corresponding to the increase in the reserve.

In its Order Granting Defendants' Motion to Dismiss the shareholders' complaint for failure to state a claim, the district court held that "[n]othing in plaintiffs' voluminous complaint states facts which support a coherent theory of securities fraud." The court concluded that the shareholders' Amended Complaint alleged non-actionable "fraud by hindsight," and characterized the shareholders' suit, purportedly based on a three-month conspiracy among the defendants to conceal or misrepresent the Bank's financial health by understating loan loss provisions, as one more accurately describing mismanagement by Wells Fargo, or perhaps a violation of the applicable banking regulations. As the district court explained, "[t]he fact that defendants increased loan loss reserves in the second quarter, and at all times relevant accurately reported the amount of actual reserves set aside by the bank, does not by itself allege securities fraud, notwithstanding conclusory statements of fraud in the complaint." Stating that the shareholders' Amended Complaint, "a collaborative effort by a dozen law firms with significant experience in [the] field of securities litigation," "cannot be further improved," the district court granted Wells Fargo's motion to dismiss the federal securities law causes of action with prejudice. Finally, pursuant to 28 U.S.C. § 1367(c)(3), the court declined to exercise its supplemental jurisdiction to hear the shareholders' two remaining state law claims.

II

A dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) is a ruling on a question of law and as such is reviewed de novo. *Oscar v. University Students Co-op. Ass'n*, 965 F.2d 783, 785 (9th Cir.) (en banc), *cert. denied*, — U.S. —, 113 S.Ct. 655, 121 L.Ed.2d 581 (1992). All allegations of material fact are taken as true and construed in the light most favorable to the plaintiff. *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir.1989).

III

A.

■ The shareholders contend that the allegation that Wells Fargo intentionally or recklessly understated its loan loss reserves in an effort to inflate corporate earnings (and therefore earnings per share), and then disseminated financial statements reflecting this misallocation to the public and to the SEC, states a claim under § 10(b) and Rule 10b–5. Noting that a bank's loan loss reserve is set based on the risk of loss posed by the aggregate of a bank's loan transactions, the shareholders argue that the deliberate failure to recognize problem loans, thus understating the reserve, constitutes an actionable omission or misrepresentation of existing fact which cannot be dismissed as a mere matter of internal mismanagement, unsound business practice, or poor accounting judgment.

■ The shareholders are correct. To state a claim under § 10(b) and Rule 10b–5, the shareholders must allege that Wells Fargo knowingly or recklessly published an "untrue statement of fact" or omitted to state a material fact "necessary to make the statements made, in light of all the circumstances in which they were made, not misleading." *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir.1989), *cert. denied,* 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990). Wells Fargo's financial statements contain no "untrue statements of fact"—the shareholders do not dispute that Wells Fargo accurately disclosed the amount allocated by the Bank to its loan loss reserves. Thus, the shareholders must identify some omission of material fact necessary to make Wells Fargo's literally accurate reporting of the size of its reserve not misleading. In substance, the shareholders allege that Wells Fargo's statement of its loan loss reserves failed to disclose—*i.e.,* failed to reflect—certain loans that Wells Fargo knew were "in jeopardy." The shareholders list a representative selection of those bad loans which, in their view, Wells Fargo should have recognized by adjusting its reserves accordingly. Alleged problem loans, of which Wells Fargo was "on notice" prior to the start of the Class Period

and failed properly to disclose, include loans extended to Revco D.S., Insilco Corp., Charter Medical Corp., R.H. Macy & Co., Campeau Corp., Jim Walters Corp., Gaylord Container Corp., West Point Pepperell, Inc., and NWA, Inc. The shareholders allege that Wells Fargo's non-performing assets and its reserves for possible loan losses were understated by at least $400 million and $350 million respectively, due to defaults on and the doubtful collectability of a number of its loans.

Accurate information regarding a bank's specific, substantial loans, with respect to which the alleged understating of value totals nearly $400 million in this case, cannot be deemed non-material as a matter of law. In *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 276–77 & n. 6 (3d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992), plaintiffs alleged that UJB Corp. fraudulently inflated its "earnings, assets, and net worth" by understating "its non-performing loans" and by failing "to provide adequate loan loss reserves for problem loans promptly and properly." The plaintiffs further alleged that UJB issued a series of statements which "misrepresented the true status of the company's loan loss reserves, financial health, lending practices, and internal controls." *Id.* at 280.[4] The court stated:

> There is nothing unique about representations and omissions regarding loan loss reserves that removes them from the purview of the antifraud provisions of the federal securities laws. In our view a reasonable investor would be influenced significantly by knowledge that a bank has knowingly or recklessly hidden its true financial status by deliberately misstating its level of non-performing loans, failing to provide adequate reserves, and indulging its problem loan customers.

*Id.* at 281.

■ Wells Fargo initially asserts that "an increase in the loan loss reserve, without more, does not warrant an inference of fraud," and "that an increase in the loan loss reserve from one quarter to the next does not alone imply that earlier estimates of the

---

4. *See* Part III–B *infra.*

reserve were fraudulently understated." Yet, the shareholders' allegations do aver "something more": the deliberate failure to disclose the status of certain specific loans extended to identified borrowers. Wells Fargo responds that the Amended Complaint is deficient because it does not state how much the nine named corporations borrowed; when the loans were made; whether these loans were in default and, if so, when the default occurred; or whether reserves should have been established (but were not), and, if so, when and on what basis. However, this level of specificity is not required at the pleading stage. *See Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir.1989) ("A pleading is sufficient under rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations.").

■ Wells Fargo's principal contention is that the shareholders' allegations amount to non-actionable mismanagement, not actionable securities fraud. It relies on *Santa Fe Indus. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), in which the Court held that "Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement." *Id.* at 479, 97 S.Ct. at 1304. Characterizing the shareholders' Amended Complaint as one which challenges the timing of Wells Fargo's disclosure or some other "material deficiency in the administration of the loan loss reserve," Wells Fargo emphasizes that the calculation of reserves is an uncertain, "dynamic" process, and necessarily is based in large part on the judgment and discretion of corporate management. While the setting of loan loss reserves is, by all accounts, an "art and not a science," we do not believe that the broad corporate management exclusion from § 10(b) and Rule 10b-5, set forth in *Santa Fe*, is implicated when plaintiffs allege specific misrepresentations or material nondisclosures in violation of the federal securities laws. *See Virginia Bankshares, Inc. v. Sandberg*, — U.S. —, —, n. 6, 111 S.Ct. 2749, 2758 n. 6, 115 L.Ed.2d 929 (1991) ("Although a corporate transaction's 'fairness' is not, as such, a federal concern," a corporation's published claim of fairness "presupposes a factual integrity that

federal law is expressly concerned to preserve"); *Hayes v. Gross*, 982 F.2d 104, 106 (3d Cir.1992) ("[A]n allegation of mismanagement on the part of a defendant will not alone support a claim under § 10(b) or Rule 10b-5; nor will an allegation that a defendant failed to disclose the existence of mismanagement.... [H]owever, ... a complaint does allege an actionable misrepresentation if it alleges that a defendant was aware that mismanagement had occurred and made a material public statement about the state of corporate affairs inconsistent with the existence of the mismanagement."). That Wells Fargo's loan reserves were inadequate throughout the relevant period is not in serious dispute; "rather, the question [is] whether the inadequacy was in some sense culpable because the contingencies which proved them inadequate were foreseen or foreseeable." *Blackie v. Barrack*, 524 F.2d 891, 904 (9th Cir.1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976); *see also Urbach v. Sayles*, 779 F.Supp. 351, 354–55 (D.N.J.1991) ("Although a manager may never 'know' with absolute certainty that a reserve against anticipated losses is inadequate, there will be circumstances where she 'knows,' based on any plausible and acceptable means of calculation, projection, or forecast, that reserves must be increased and yet represents that they need not be."). The shareholders allege that Wells Fargo knew of certain "contingencies" which rendered its loan reserves "inadequate," and failed to disclose this information to purchasers of its stock.

Therefore, taking the allegations of the Amended Complaint to be true, as the court must on a Rule 12(b)(6) motion, this is neither a case second-guessing decisions by management nor one alleging "fraud by hindsight"; rather, the shareholders have specifically identified facts omitted by Wells Fargo, which if subsequently determined to be material, and issued by Wells Fargo with the requisite scienter, will establish a violation of § 10(b) and Rule 10b-5. The cases upon which Wells Fargo places most weight do not dictate a different result, because unlike the present situation, the plaintiff in each of the cited decisions failed to point to alleged facts

suggesting that the defendant's failure to disclose its "financial deterioration[ ]" was "attributable to fraud." *DiLeo v. Ernst & Young,* 901 F.2d 624, 626–27 (7th Cir.) (complaint did not "give examples of problem loans that [the accounting firm] should have caught, or explain how it did or should have recognized that the provisions for reserves established by [the bank's] loan officers were inaccurate"), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990); *see also Christidis v. First Pennsylvania Mortgage Trust,* 717 F.2d 96, 100 (3d Cir.1983) (complaint's "defect [was] the complete absence of any disclosure of the manner in which, in establishing reserves for bad debts in the financial statements relied upon, the defendants knowingly departed from reasonable accounting practices"); *Denny v. Barber,* 576 F.2d 465, 469 (2d Cir.1978) (complaint failed to specify "what loans, at what times, and in what amounts were 'risky,'" or which items in defendant's annual report were knowingly false). Here, the shareholders' allegations successfully "distinguish their situation from that of many other[ ] [investors] who are adversely affected by business reverses." *DiLeo,* 901 F.2d at 627.

### B

The shareholders contend that, in addition to sending a misleading message to the market in its financial reports, Wells Fargo "made affirmative representations inconsistent with the state of corporate affairs they knew to exist." *Hayes,* 982 F.2d at 106. The shareholders allege that Wells Fargo falsely portrayed itself as a successful company with favorable future prospects for growth and profit, concealed that many of Wells Fargo's highly leveraged transaction ("HLT") and real estate loans were high-risk in character and near default, and failed to disclose Wells Fargo's non-compliance with banking and accounting regulations governing the treatment of such problem loans. The shareholders allege that Wells Fargo

knew or should have known that its various statements, while often literally accurate, "contributed to an overall misleading impression of the financial condition and business prospects of Wells Fargo." [5]

For example, the shareholders allege that Wells Fargo's 1990 Annual Report falsely "reassured the investing public":

The year 1990 was marked by the threat of war in the Persian Gulf, a faltering economy and a continuous stream of bad news affecting the nation's financial services industry.

In these unsettled times, investor concerns about what lay ahead for Wells Fargo and the California economy largely overshadowed the Company's steady financial performance.

Net income for the year rose 18%, to $711.5 million. Earnings per common share were $13.39, an increase of 22% in comparison with last year's $11.02 per share.

\*     \*     \*     \*     \*     \*

Defensive actions—redoubling surveillance of our real estate and corporate loan portfolios, working out arrangements with delinquent borrowers, trimming back corporate and real estate banking activities, increasing loan loss reserves, and strengthening the Company's capital base—occupied an increasingly important place in our day-to-day agendas.

\*     \*     \*     \*     \*     \*

With the bulk of its loans and practically all of its deposits concentrated in California, Wells Fargo Bank has been a major contributor to—and beneficiary of—the state's economic growth.

\*     \*     \*     \*     \*     \*

In short, we remain optimistic about California's prospects—and we still believe that our sharply focused regional marketing strategy is right for Wells Fargo.

---

5. Wells Fargo argues that these quotations are incomplete and are "wrenched out of context or edited in ways that change meaning." We disagree. Several of the shareholders' claimed misstatements identified by Wells Fargo are taken from the Appellants' Opening Brief, not the Amended Complaint. Other examples of "selective quotation" offered by Wells Fargo, while certainly presenting information in a manner favorable to the shareholders, are neither misleading nor unfair.

Over the years Wells Fargo has adopted a number of lending practices, pricing policies and credit standards designed to compensate for, and partly offset, the risks inherent in banking real estate and corporate credits. These practices have worked well for us in the past, and we believe they are especially appropriate to today's relatively high-risk banking environment.

\* \* \* \* \* \*

But in the final analysis, whatever success we've had in corporate and real estate lending is due to two things: good customers and a well-seasoned team of senior lending officers.

\* \* \* \* \* \*

Among other things, experience has taught us to anticipate and react quickly to potential problems—and to recognize small problems before they become big ones. It has also taught us to place as much faith in our analysis of our borrowers' integrity and their ability to pay as in the value of their collateral.

With respect to HLT loans, Wells Fargo's 1990 Annual Report stated:

> During the 1980s, Wells Fargo's Corporate Banking Group assisted in financing the restructuring, acquisition or buyout of slightly more than one hundred American corporations. Typically, Wells Fargo acted as lead banker and senior lender in these highly leveraged transactions (HLTs), providing secured term loans with average maturities of five to seven years. Normally, repayment schedules were based on reasonable projections of cash flow from operations, rather than the sale of corporate assets.
>
> \* \* \* \* \* \*
>
> The risks related to our HLT portfolio differ in two significant respects from those involved in real estate lending. First, the HLT portfolio is widely diversified, both geographically and by industry. Second, our experience in this type of lending has not been tested by recession. These differences make it more difficult to anticipate how the HLTs as a group will perform over the next 12 months. All we can say with certainty is that we will be

exercising even more than our customary diligence in managing our HLTs as well as all other segments of our loan portfolio in coming months.

\* \* \* \* \* \*

The Company believes at the present time that these loans are substantially secured by the assets of the borrowers. In addition, at December 31, 1990 and 1989, senior HLT loans past due 90 days and still accruing were $8 million and $209 million, respectively. There were no HLT loans on restructured status and there was no ORE resulting from HLT loans at December 31, 1990 and 1989. Senior HLT loans of $36 million and $30 million were charged off in 1990 and 1989, respectively. During an economic downturn or a sustained period of rising interest rates, HLT borrowers may experience a decrease in their financial performance greater than that of non-HLT borrowers.

The shareholders allege that with respect to non-HLT loans, Wells Fargo "supplied numerous charts and tables, none of which warned the investing public of the full extent of the risks inherent there." The shareholders allege that Wells Fargo stated:

> The Company's determination of the level of the allowance, and correspondingly, the provision for loan losses rests upon various judgments and assumptions including, but not limited to, general economic conditions, loan portfolio composition and prior loan loss experience. The Company considers the allowance for loan losses of $885.4 million adequate to cover losses inherent in loans; commercial, real estate and other loan commitments; and standby letters of credit as of December 31, 1990.

Further, the shareholders allege that in subsequent SEC filings and financial statements, Wells Fargo falsely represented that its reported data "included all adjustments and provisions necessary for fair presentation of its results in conformity with Generally Accepted Accounting Principles ('GAAP')," Regulatory Accounting Principles ("RAP"), and various banking regulations. Finally, the shareholders allege that in a June 1991 article in *Barrons'* financial weekly, Wells

Fargo dismissed the claim that the Bank would face an increase in non-performing real estate loans for the second quarter of 1991, and in response to media inquiries following a drop in the trading price of Wells Fargo stock on June 24, 1991, Wells Fargo stated that "it knew of no reason to explain" the drop in its stock price.

■ Where a defendant affirmatively characterizes management practices as "adequate" or loans as "substantially secured," "a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully." *Shapiro*, 964 F.2d at 282. Statements of reasons, opinions, or beliefs are "factual" for purposes of the securities laws, and thus are actionable under § 10(b), if "one of three implied factual assertions is inaccurate: (1) that the statement is genuinely believed, (2) that there is a reasonable basis for that belief, and (3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 501 (9th Cir.1992) (quotation marks and citation omitted); *see also Mayer v. Mylod*, 988 F.2d 635, 639 (6th Cir.1993).

At least two of the Wells Fargo statements upon which the shareholders rely may be opinions of the sort classified as "factual" for purposes of § 10(b): "[t]he Company believes at the present time that these [HLT] loans are substantially secured by the assets of the borrowers" and "[t]he Company considers the allowance for loan losses of $885.4 million adequate." Because we believe at least these two statements cannot be dismissed as non-actionable as a matter of law, we do not examine in detail each of the other allegations that the shareholders make. We do note, however, that the vast majority of the "deceptive" statements catalogued in the shareholders' Amended Complaint are not

alleged to be factually inaccurate and pertain to Wells Fargo's past performance. These are clearly not materially misleading. *See In re Convergent Technologies Sec. Litig.*, 948 F.2d 507, 513 (9th Cir.1991) ("The challenged statements do not imply any comparison between the rate of past and future growth. They simply report past performance and assert specific limited predictions for the future."). Whether other statements by Wells Fargo are actionable, such as allegations that Wells Fargo failed to comply with various accounting rules and banking regulations governing classification of loans and public disclosure, depends on whether the shareholders can make out the existence of an underlying material misstatement or omission of which Wells Fargo had knowledge. We leave further analysis to the district court.

■ The shareholders have specifically identified Wells Fargo's allegedly misleading statements and, as discussed in Part III–A, allege that these statements were not believed by Wells Fargo when published, lacked any reasonable basis, and were made despite known, undisclosed facts tending seriously to undermine their accuracy. Accordingly, the shareholders have stated a claim under § 10(b) and Rule 10b–5. While it may well turn out, as Wells Fargo maintains, that the contested statements are neither material nor misleading when considered in context, that is a determination better made on the kind of record which a motion for summary judgment affords.[6]

IV

■ Wells Fargo argues that the shareholders have failed to allege facts which provide a basis for the inference of scienter.[7] Contrary to Wells Fargo's assertion, the shareholders allege facts to show that Wells

---

6. The shareholders also argue that their allegation that Wells Fargo failed to comply with the mandate of SEC Regulation S–K, Item 303 states an actionable securities fraud claim under § 10(b). *See* 17 C.F.R. § 229.303(a)(3)(ii). Acknowledging that Regulation S–K does not provide an independent cause of action, the shareholders contend that an SEC filing which does not comply with Item 303 creates a "false and misleading impression," and thus is highly rele-

vant for purposes of determining whether a violation of § 10(b) and Rule 10b–5 has occurred. We do not reach this point in light of our disposition of their claims under Rule 10b–5.

7. Wells Fargo's claim that the shareholders failed sufficiently to plead scienter was not addressed directly by the district court.

Fargo knew or recklessly ignored that its challenged statements were materially misleading, and that the Wells Fargo defendants "stood to receive more compensation because of the alleged non-disclosure of material information." While "allegation[s] of unusual insider trading by defendants immediately preceding the disclosure of negative news" may be, as Wells Fargo contends, a characteristic of a "typical securities fraud class action," they are not required. The allegations of motive and opportunity in the complaint are sufficient to establish a basis for inferring Wells Fargo's fraudulent intent. *Cf. Blake v. Dierdorff*, 856 F.2d 1365, 1369–70 (9th Cir.1988) (allegations that corporate management distributed false and misleading information to protect their executive positions and substantial compensation, and to increase bonus compensation pled specific intent to commit mail fraud with the requisite particularity). The cases relied upon by Wells Fargo do not support its argument, as they involve appeals from either summary judgment or dismissals of complaints which were substantially more general and conclusory than the shareholders' in the present case. *See e.g. Apple Computer*, 886 F.2d at 1117 (no genuine issue of material fact as to scienter where plaintiffs produced no evidence controverting defendants' affidavits stating that contested statements were made in good faith); *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1469–72 (9th Cir.1987) (summary judgment record contains no evidence that defendants had the requisite intent to defraud, nor did plaintiffs' claim make economic sense), *cert. denied*, 484 U.S. 1006, 108 S.Ct. 698, 699, 98 L.Ed.2d 650 (1988); *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1220 (9th Cir.1980) (plaintiffs present no probative evidence relevant to the issue of intent to defraud); *see also Wexner v. First Manhattan Co.*, 902 F.2d 169, 172–73 (2d Cir. 1990) (affirming dismissal of complaint where plaintiffs failed to allege general details of securities fraud conspiracy, how defendants knew contested statements to be false, roles of individual defendants, or how defendants stood to gain as a result); *Connecticut Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 961–62 (2d Cir.1987) (according to facts pled, no plausible economic incentive for defendants to deceive shareholders).

## V

The shareholders read the district court's Order Granting Defendants' Motion to Dismiss as holding that the shareholders failed to meet the "in connection with" requirement of a § 10(b) claim—*i.e.*, that Wells Fargo's alleged fraud was employed "in connection with" the purchase or sale of securities. While the shareholders' interpretation is reasonable based on certain language in the district court's order (*e.g.*, the "fraud alleged must 'touch' upon securities transactions") and the court's citation to *SEC v. Clark*, 915 F.2d 439, 449 (9th Cir.1990), we need not decide this issue as Wells Fargo effectively concedes that the "in connection with" requirement was met.

## VI

We conclude that the shareholders have stated a claim under section 10(b) of the '34 Act and Rule 10b–5. Accordingly, we reverse the district court's order dismissing the shareholders' Amended Complaint.

REVERSED.

TROTT, Circuit Judge, dissenting.

I respectfully dissent, and I do so essentially because I believe our colleague on the district court had it right when he dismissed this complaint for failure to state a claim. I can do no better than repeat the essence of his analysis:

In order to survive a motion to dismiss, plaintiffs who allege securities fraud must plead facts which, if true, constitute fraud. Fed.R.Civ.Proc. 9(b). Plaintiffs are not required to assert facts pertaining to fraud that are "peculiarly within the opposing party's knowledge," but the requirements of Rule 9(b) are satisfied only if the allegations of fraud are accompanied by a statement of the facts upon which the fraud is founded. *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1439 (9th Cir.1987) (citations omitted).

Furthermore, plaintiffs' facts, and the inferences which reasonably can be drawn from them, must support a claim of fraud in the purchase or sale of securities. The federal securities laws do not proscribe all fraud which occurs in the business world. The fraud alleged must "touch" upon securities transactions. *S.E.C. v. Clark,* 915 F.2d 439, 449 (9th Cir.1990).

Nothing in plaintiffs' voluminous complaint states facts which support a coherent theory of securities fraud. Plaintiff's (sic) theory begins with heightened federal regulatory guidelines, issued in January, March and May of 1991, which suggested (but did not require) changes in the methods banks use to value nonaccrual loans and highly leveraged transactions. Plaintiffs then describe what they allege to be a three month long "scheme" by the defendants to misrepresent the Bank's financial health through understated loan loss provisions for the first quarter of 1991. Despite a complaint of 59 pages, containing 134 paragraphs of allegations, plaintiffs' counsel was unable to point to one paragraph or set of paragraphs which provide the facts necessary to infer fraud in the purchase of (sic) sale of securities.

Indeed, the facts in the complaint, which may suggest mismanagement on the part of the Bank, and might even suggest a violation of banking regulations, cannot be fairly read to raise an inference that the alleged misconduct by the defendants touched upon a securities transaction. The fact that defendants increased loan loss reserves in the second quarter, and at all times relevant accurately reported the amount of actual reserves set aside by the bank, does not by itself allege securities fraud, notwithstanding conclusory statements of fraud in the complaint.

Judge Friendly, in adjudicating a securities fraud claim from an earlier period of financial reversals in the banking industry, characterized a complaint similar to the one filed in this matter as "an example of alleging fraud by hindsight." *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978). Judge Friendly recognized the difficulties encountered by a small shareholder in framing a securities fraud complaint

against a large corporation, and the consequent need to relax pleading requirements, but dismissed the complaint in *Denny* because "there still must be more than vague allegations that, as shown by subsequent developments, the corporation's true financial picture was not so bright in some respects as its annual reports had painted and that the defendants knew, or were reckless in failing to know, this." *Id.*

In the argot of today, a complaint should be dismissed if, read as a whole, it creates a strong impression that, on a report of bad news from the defendant, "plaintiffs' counsel simply stepped to the nearest computer console, conducted a global Nexis search, pressed the 'Print' button, and filed the product as their complaint." *Hershfang v. Citicorp,* 767 F.Supp. 1251 (S.D.N.Y.1991). Here, plaintiffs cite annual reports, quarterly reports, banking regulations and newspaper articles. They list customers of the Bank who are known today to be burdened with debt. But nowhere does the complaint link the facts stated to a coherent theory of securities fraud.

Fraud on the market is a problematic theory. Unless carefully managed by us, it threatens to wrack our economy. Anytime a stock price drops significantly, will all prior rosy statements by management concerning the company's financial condition and future business prospects become the basis for actionable fraud?

I note with great interest that the supposedly defrauded stockholders in this case state in their complaint that "the trading price of Wells Fargo's common stock, upon disclosure [of the "fraud"] ... collapse[d] ... from over $97 per share to $74 per share." I note with equally great interest that the trading price of this stock on the day of oral argument, May 10, 1993, was $104.75. This is an interesting kind of fraud where the value of the disputed stock before the case goes to trial exceeds its value before the alleged wrongdoing that caused it to "collapse." I would suspect that on remand the district court will be confronted with an interesting motion for summary judgment.

When businesses complain about the costs heaped on them by a court system with no adequate controls, I believe they will be able to point to this litigation as an example.